No. 71,188

STATE OF KANSAS, *Appellee*, v. DAMON E. COX, *Appellant*.

(908 P.2d 603)

558

Opinion filed December 8, 1995.

*Wendy L. Rhyne Slayton*, special appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with her on the brief for appellant.

*Allen A. Ternent*, county attorney, argued the cause, and *Patrick E. Henderson*, special prosecutor, and *Carla J. Stovall*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

SIX, J.: This case presents first impression sentencing issues under the Kansas Sentencing Guidelines Act (KSGA), K.S.A. 1993 Supp. 21-4701 *et seq*. Specifically, what should be the focus of the

trial court in considering the imposition of an upward sentence departure for aggravated robbery and conspiracy to commit robbery upon a defendant also convicted of felony murder as an aider and abettor? See K.S.A. 1993 Supp. 21-4716(b)(2)(B). Should only the defendant's individual conduct be considered for sentencing departure purposes or may the trial court look to aider and abettor liability? May a felony-murder conviction provide the basis for an upward sentence departure for conspiracy to commit robbery?

Damon E. Cox appeals his jury trial convictions of felony murder, K.S.A. 1993 Supp. 21-3401(b), aggravated robbery, K.S.A. 1993 Supp. 21-3427, and conspiracy to commit robbery, K.S.A. 1993 Supp. 21-3302 and K.S.A. 1993 Supp. 21-3426, arising from the carjacking and shooting death of Marcus Smith. Cox was sentenced to life for the felony murder. The trial court granted an upward departure on the other two offenses. Cox asserts sentencing error in (a) granting upward departures and (b) imposing an excessive total imprisonment term.

Cox raises numerous assignments of error besides the sentencing issues. He contends that the trial court: (1) erroneously allowed the State to introduce gang evidence and gave an erroneous gang evidence instruction; (2) erred in admitting a codefendant's hearsay statement, contrary to the teaching of *Bruton v. United States*, 391 U.S. 123, 137, 20 L. Ed. 2d 476, 88 S. Ct. 1620 (1968); (3) failed to remove four venirepersons for cause; and (4) erred in admitting oral hearsay evidence that the vehicles used by the perpetrators were stolen.

Our jurisdiction is under K.S.A. 1993 Supp. 22-3601(b)(1) (offgrid crime conviction).

We find no reversible error on issues (1) through (4) and affirm the convictions. On the sentencing issues, we hold that K.S.A. 1993 Supp. 21-4716(b)(2)(B) requires that only the defendant's individual conduct during the commission of the current offense be reviewed when considering the imposition of a departure sentence. Consequently, we vacate the sentence for aggravated robbery. We also hold that a killing resulting in a conviction of felony murder may not be used, under the facts of this case, as the basis for an upward sentence departure for a conviction of conspiracy to com-

mit robbery. We also vacate the sentence of conspiracy to commit robbery. We affirm the felony-murder sentence and remand for resentencing on the other convictions.

## FACTS

On July 30, 1993, five teenagers, including Cox, caravanned to Atchison from Kansas City, Missouri, in three separate vehicles. Michael Hayes, who went by the nickname "Kilo," drove alone. The other teenagers were paired in two vehicles.

While in Atchison, the group, which included Stefan Wheeler, Jared Owens, Carrie Vincent, Kilo, and Cox, stopped 24-year-old Marcus Smith, who was driving a Honda with distinctive oversized tires. One member of the group knew Smith and talked with him briefly. Kilo then told some friends that they were going to "gank" Smith. The group's first encounter with Smith ended peacefully.

Later that afternoon, the group saw Smith again and surrounded his car. Kilo retrieved a gun from the glove compartment of the car Cox was driving and put the gun to Smith's head, ordering Smith out of his car. Smith then laid down on his stomach. Kilo told Wheeler in an "evil-sounding" voice to drive Smith's car. Wheeler jumped into Smith's car and started driving away. Vincent also drove away. Gunshots rang out. Marcus Smith was left dead, lying in the middle of the street, with two gunshot wounds to his back and one to the back of his head.

Wheeler, the only defendant who testified, understood the purpose of the trip to Atchison was to look for girls. Wheeler had known Kilo approximately 2 months, having seen him on occasions when Wheeler visited Cox, his cousin. Wheeler and Owens had lived in the same housing complex 8 years earlier. Wheeler first met Vincent the day before the killing. Wheeler, Owens, and Cox had been driving around all night July 29. Cox wanted to see Kilo. Late that night, they drove to the place where Kilo was staying. Vincent joined them there about 4 to 5 a.m. on July 30. Later in the morning of the 30th, the group drove together to Atchison. Wheeler testified he had obtained the two-door Blazer the night before for $10. Wheeler testified he did not realize that the Blazer was stolen until the group stopped in Leavenworth on the way to Atchison.

A pathologist testified that the wound to Smith's head was fatal. The "tattooing" from gunpowder around the wound showed the gun was fired within inches of the victim's head.

At the time the group's three vehicles were recovered, the police checked the vehicles' registration and ownership with the Department of Motor Vehicles. The check revealed that the vehicles had been stolen from Kansas City, Missouri, late on July 29, 1993, or early in the morning of July 30, 1993.

Detective Wilson wrote up a voluntary statement from Vincent, attempting to use Vincent's words. Vincent confirmed the contents and signed the statement. Vincent gave another voluntary statement to Wilson, admitting that she saw Kilo take the gun out of the glove compartment of the Jeep and use it to shoot Smith twice in the back. She admitted driving away from the scene in the black Blazer, hearing more shots as she headed toward Leavenworth. Detective Wilson also read Vincent's second statement in redacted form at the trial.

Cox, following his arrest, gave a voluntary statement to Detective Wilson. At trial, Wilson read this statement to the jury in redacted form.

Wilson testified that during his interview with Cox, Cox told him that he belonged to rap music groups named Dark Side Posse, Scandalous City Mafia, and Down By Law.

Four of the defendants—Cox, Wheeler, Owens, and Vincent—were tried jointly as aiders and abettors on the murder charge. Cox and Vincent, each 17 at the time of the offense, were certified to be tried as adults. Vincent was convicted of the same offenses as Cox. See State v. Vincent, 258 Kan. 694, 908 P.2d 619 (1995). Wheeler was convicted of aggravated robbery and acquitted on the other charges. Owens was acquitted on all charges. Kilo was tried separately and convicted. See State v. Hayes, 258 Kan. 629, 908 P.2d 597 (1995).

## DISCUSSION
### Gang Evidence

Cox argues that his constitutional right to a fair trial has been denied by the court's improperly admitting gang expert testimony and erroneously instructing the jury on gang evidence. Cox asserts

our review should be de novo. We do not agree. Abuse of discretion is the standard we apply when reviewing the admission of gang expert testimony. See K.S.A. 60-456(b); *State v. Tran*, 252 Kan. 494, Syl. ¶ 1, 847 P.2d 680 (1993). Our standard of review for jury instructions is stated in *State v. Butler*, 257 Kan. 1043, Syl. ¶ 10, 897 P.2d 1007 (1995).

Hardie T. Smith of the Kansas City, Missouri Police Department worked as the Coordinator of the Street Gang Task Force. Officer Smith testified that: (1) a gang is defined as a group of three or more individuals who exist for the sole purpose of committing a criminal act or acts of intimidation and continue their association; (2) gang members may range from 8 to 42 years in age and can be of either sex; (3) both sexes can belong to the same gang, and any race or mixtures of races can be in the same gang; (4) gangs sometimes have names; (5) gangs may call themselves crews or a mob; (6) gang members sometimes say they are part of a rap group, singing group, or community organization; and (7) gangs have been known to be involved in carjacking, which is the taking of a vehicle by robbery.

Cox's counsel timely objected, arguing that Smith's testimony was irrelevant and prejudicial.

We have affirmed the admission of gang evidence (a) to show motive for an otherwise inexplicable act, *State v. Toney*, 253 Kan. 651, 653-55, 862 P.2d 350 (1993); *Tran*, 252 Kan. at 505; or (b) as part of the res gestae, *State v. Walker*, 252 Kan. 117, 137, 843 P.2d 203 (1992); *State v. Hooks*, 251 Kan. 755, 765-66, 840 P.2d 483 (1992).

Gang evidence is only admissible where there is sufficient proof that membership or activity is related to the crime charged. *Tran*, 252 Kan. 494, Syl. ¶ 6. The expert must be qualified to impart to the jury knowledge within the scope of the expert's special skill and experience that is otherwise unavailable to the jury. 252 Kan. at 502. The reason for the admission of expert testimony is necessity arising out of the particular circumstances of the case. To be admissible, expert testimony must be helpful to the jury. Admission of expert testimony is governed by K.S.A. 60-456(b).

The State presented evidence that the group originated in Kansas City and traveled together in three separate vehicles to Atchison on the morning of the killing. The vehicles were similar in color and type (two black late-model Blazers and a dark green late-model Jeep Cherokee). Once in Atchison, the vehicles traveled caravan-style to several locations. The group followed Smith, the victim, and made at least two contacts with him before the carjacking. Two people in the group, Kilo and Vincent, stated to a third person that they were going to "gank Marcus." The group followed one of Smith's basketball friends around the park in the three vehicles shortly before the shooting. The defendants were seen standing outside their vehicles talking together at the park shortly before the incident. A witness testified seeing the driver of the Jeep hit his hand on the side of the vehicle as a signal for Vincent to get back into the vehicle so they could pursue the victim. The three vehicles surrounded Smith's car at the carjacking site. The group fled together with the stolen vehicle after the shooting, stopping together on the highway between Atchison and Leavenworth. Cox stated: "The purpose of stealing the gray car was to strip it once we were in Kansas City. The gun used came from Kansas City where we have a lot of guns that I do not want to talk about."

The State sought to bring in gang evidence to show that the carjacking was gang activity engaged in by the defendants. According to the State, Officer Smith's statement that gang members may sometimes say they belong to rap groups, coupled with Cox's statement that he belonged to three rap groups, provided the inference, under Officer Smith's definition, that Cox was a gang member. Cox's status as a rap group member, or even a gang member, seems more relevant to explaining the actions of the defendants in Atchison if additional evidence had linked those defendants to the same rap group or gang. A review of the pretrial proceedings is helpful at this point.

At the pretrial motions hearing, the trial court took up the State's motion to introduce gang evidence. The State argued that the evidence was important because the State's theory was aiding and abetting. Gang evidence was also important to the State in proving conspiracy (the State wanted the jury to hear that the codefendants

belonged to the same group). The State told the court that there was evidence that one of the defendants (presumably Cox) had admitted gang membership. The court was informed that evidence regarding reactions to certain colors of clothing evidencing gang membership would be presented. The State also argued that an expert would be needed to define the term "gank" and "that type of terminology." Cox's counsel stated that Cox had only told the officer that he was a member of certain rap groups and had not admitted gang membership. The court took the matter under advisement.

Gang evidence came up again at another pretrial motions hearing. Beyond restating its previous arguments, the State told the court that the gang evidence was needed to refute a claim of compulsion advanced by Wheeler. The court said that the term "gank" had nothing to do with gang membership. Cox's counsel objected to the State bringing in an expert to define "gank" because the jury would then view the association between the codefendants as gang membership even if there was no gang evidence. Cox argued that before allowing an expert to testify, the State needed to present some evidence indicating gang membership by the codefendants and that evidence was relevant to the offenses charged. The court gave the State 5 days to come up with evidence showing gang membership.

At the final pretrial motions hearing, Cox's counsel objected to the proffer filed by the State, alleging that the proffer did not show gang evidence and relevancy. According to the proffer, the evidence at trial would show that (1) Cox admitted membership in a gang called the Scandalous City Mafia; (2) a hat bearing such an insignia was found in one of the cars; (3) Kilo had become upset when he saw others wearing red and had waved a blue handkerchief at them. The proffer also asserted that a police expert needed to testify to explain the importance of color of clothing, to acknowledge gang membership of the defendants, and to define gang terminology. The court found that based on the State's proffer, the evidence was relevant.

The State's problem on appeal arises because the evidence the State introduced at trial did not follow the proffer. Neither evi-

dence of characteristic gang dress nor evidence of any adverse reactions by any of the defendants to others wearing colors was introduced. The State did not present any evidence of gang membership by any member of the group.

After Officer Smith testified, Cox's redacted statement that Cox was a member of three rap groups, including the Scandalous City Mafia, was also read to the jury. Cox's rap group membership, assuming rap group membership is to be equated with gang membership, was the only evidence linking any of the group to a gang.

While there was evidence suggesting that the defendants and Kilo were acting in concert, there was no evidence suggesting either gang involvement or gang motivation. The fact that there was evidence suggesting a conspiracy between young people to commit a crime does not make expert testimony regarding gangs relevant. The logic used to find relevancy is flawed. The State through the testimony of its gang expert advanced the premise that a person who belongs to a rap group is a member of a gang: Cox belongs to a rap group; therefore, Cox, the other three defendants, and Kilo are members of a gang.

This case is distinguishable from *Toney*, 253 Kan. at 653 (murder committed in retaliation for a prior gang incident), and *Tran*, 252 Kan. at 505 (motive for murder was to get even with a rival gang). No evidence was introduced here to suggest that the motive for the killing was gang related.

The trial court gave the following instruction concerning gang evidence to the jury:

"Evidence has been admitted in this case that each of the defendants are members of a gang. This evidence may be considered solely for the purpose of proving their motive, interest, or bias for their actions, but only for that limited purpose."

We conclude that the trial court abused its discretion by admitting the gang expert testimony and instructing on gang membership.

We then must decide whether the error is harmless. The harmless error standard of review requires us to declare beyond a reasonable doubt that the error had little, if any, likelihood of changing

the result at trial. *State v. Davis*, 256 Kan. 1, 17, 883 P.2d 735 (1994); see K.S.A. 60-261.

The State presented independent evidence, including Cox's statement, establishing the elements of the crimes of which Cox was convicted. Officer Smith's testimony concerning gang activity was brief. The State neither emphasized the gang aspect of his testimony in opening or closing statements nor mentioned Cox's association with rap groups. We find support for our harmless error analysis in the jury's verdicts. Owens was acquitted of all charges. Wheeler was convicted only on the aggravated robbery charge. The jury appeared to have based its verdicts on the evidence of the four defendants' conduct concerning the carjacking, not on gang membership per se. We conclude that the admission of Officer Smith's gang testimony and the use of the gang instruction were harmless errors.

Cox argues that the admission of gang testimony also violated K.S.A. 60-455. We have already found that argument deficient in two prior cases: *State v. Bailey*, 251 Kan. 156, 166, 834 P.2d 342 (1992), and *Hooks*, 251 Kan. at 765-66. Cox fails to point to any reason why we should decide differently in this case.

### The Term "Gank"

The State called Officer Smith to provide the definition for the jury of the street term "gank." Before Officer Smith's testimony, the State asked one of its witnesses, Toi Allen, a resident of Atchison, if she had heard the term "gank." She said, "To me, it means if someone's going to take some money from you or like that." Judy Jolly, another witness for the State, testified that Lonetta Williams asked her what the term "gank" meant because Vincent had told Williams they were going to "gank" Marcus. Jolly told Williams that she did not know what the term meant. Williams, who heard Kilo and Vincent each separately say they were going to "gank Marcus," also testified that she had never heard the term "gank" before.

What did the term mean to the persons who used the term, Vincent and Kilo? Officer Smith's knowledge of Kansas City street terms provided the jury with information they otherwise would not

be expected to have. The defendants were from Kansas City. The term "gank" was apparently not a term commonly understood in Atchison. Vincent's counsel, during cross-examination, read to the jury a different definition of "gank" from a book written by another gang authority. (During Officer Smith's cross-examination, Vincent's counsel, without objection, asked several questions concerning Smith's knowledge of *A Parent's Guide to Gangs*.) Cox's counsel did not object to the cross-examination. The meaning of "gank" was at issue. Officer Smith described the word "gank" as a street term that initially meant for one drug dealer to take drugs from another dealer. The term later came to mean to take property from someone. Sometimes, according to Officer Smith, gang terms become street terms or vice versa.

Expert testimony can explain a defendant's actions which might otherwise appear difficult to comprehend. *Tran*, 252 Kan. at 502. Officer Smith's testimony helped the jury understand the street term "gank." The trial court did not abuse its discretion in admitting that testimony.

## Codefendant Vincent's Redacted Statement

At trial, Detective Wilson read to the jury the redacted statements of Carrie Vincent, Cox, and Wheeler. The State had previously informed the court and counsel that Wilson would be reading these statements. Cox's counsel, joined by other defense counsel, objected before trial to the use of the redacted statements of any codefendants, asserting that Cox's right to confront the witnesses was violated. The trial court denied the motion. The defendants also joined in a pretrial motion to sever the trial, on the same grounds, which the trial court also denied. When Detective Wilson read Vincent's statement to the jury, Cox made no objection. Vincent's counsel, joined by all other defense counsel, objected, contending that the statement was not voluntary. The involuntary objection, however, does not raise the issue Cox now presents, *i.e.*, a violation of *Bruton v. United States*, 391 U.S. 123, 137, 20 L. Ed. 2d 476, 88 S. Ct. 1620 (1968). After Detective Wilson read Vincent's statement and before Cox's statement was to be read, Owens' counsel objected to the statements of any codefendants being read

to the jury. Other counsel joined in the objection, which the trial court overruled. The jury was not told that the statements were redacted.

Cox did join in Owens' objection to the State's use of any codefendants' statements, but not until after Vincent's first redacted statement had already been read to the jury.

Cox asserts error in the admission of Vincent's first redacted statement. To preserve an unfavorable ruling on an evidentiary question before trial as an issue on appeal, a party must make a timely objection when the evidence is introduced at trial. *State v. Peckham*, 255 Kan. 310, Syl. ¶ 7, 875 P.2d 257 (1994); see K.S.A. 60-404.

Cox has not preserved this issue for appeal. However, we reason that even if the issue of error in admitting Vincent's first redacted statement were properly before us, we would find the issue lacked merit.

Cox does not claim that Vincent's statement was distorted by the redaction. In Vincent's first redacted statement, all references to the codefendants, other than Kilo, have been removed. Cox complains that the "we's" and "they's" sprinkled throughout the statement explicitly implicate him, violating *Bruton*. (We note one "they" and one "them.") *Richardson v. Marsh*, 481 U.S. 200, 95 L. Ed. 2d 176, 102 S. Ct. 1702 (1987) authorized redaction. A *Richardson* requirement, that the trial court give a proper limiting instruction, was waived by Cox because he joined in a motion in limine requesting that no limiting instruction be given.

Other courts have sanctioned the admission of statements containing plural pronouns such as "we." See, *e.g., United States v. Briscoe*, 896 F.2d 1476, 1500 (7th Cir.) ("[w]e were given tickets in Lagos [Nigeria]"), *cert. denied* 498 U.S. 863 (1990); *United States v. Lewis*, 786 F.2d 1278, 1286 n.10 (5th Cir. 1986) ("we" and "us"). We agree with the holdings of *Briscoe* and *Lewis*. See *United States v. Bennett*, 848 F.2d 1134, 1142 (11th Cir. 1988) (substituting "they" and "them" for defendants' names still *Bruton* violation, but constitutes harmless error). Nothing in Vincent's first redacted statement implicates Cox. His name is never mentioned.

We have set out the redacted statements of Vincent and Cox.

## Vincent's Statement:

"During the past week we talked about Atchison and they wanted to go there. Kilo had been to Atchison before. Kilo called me this morning at Blue Ridge Apartment where I was staying with Melody last name unknown. Kilo wanted to go to Atchison and wanted me to go show them how to get to Atchison. I rode in the dark green Blazer. Kilo just wanted to go to Atchison. Nothing had been said about Marcus Smith. We drove around Atchison and saw Marcus Smith driving his silver Honda around the park. We were interested in the wheels on his car and the big tires. We later saw Marcus at King's. We drove in there and I spoke to Marcus who I know. I told him Kilo wanted to buy his wheels and tires. He told us to meet him at the EZ Shop. Our vehicles followed Marcus out of King's, east on Division to 8th, south on 8th to Laramie and went on Laramie where Marcus stopped. The dark green Blazer stopped next to Marcus. Marcus was against the north curb and we were next to him, both of us headed west. Kilo was driving a black Blazer. He drove in front of Marcus and parked against the north curb, also headed west. Kilo got out of the black Blazer he was in and walked in between Marcus, who was in his car, and I sat in my car. Kilo asked Marcus how much he wanted for the wheels and tires. Marcus said he didn't really want to sell them. I was leaning out the window talking to Marcus when Kilo took a gun from the glove box of my car. The gun was a dark colored revolver handgun. Kilo went to Marcus' window. At that point I got out of my car and went to the black Blazer parked behind Marcus. I didn't want to be around if anything happened so I got into the driver's seat of the black Blazer and drove off. I drove west on Laramie and as I drove by Marcus' car, Marcus was getting out of his car. Kilo had the gun in his hand. I drove to 10th Street and then heard more than two shots. I drove out of town toward Leavenworth. I ran from the police when they tried to stop us in Leavenworth."

## Cox's Statement:

"This morning my friend Kilo wanted to go to Atchison. I don't know Kilo's real name. That is what I know him by. I have known Kilo for six months. Kilo wanted to go somewhere. He wanted to go to Denver but didn't have enough money. We were going to look for girls there. Kilo knew Atchison and had been there before. I had never been there before. We drove to Atchison. I drove the green Cherokee Jeep that I later wrecked in Leavenworth. I had got this Jeep last night from a guy name George who wanted to sell it to me. Kilo drove a black Blazer. We got to Atchison and rode around. We ended up seeing a gray saw [sic]. We saw this gray car in King's. I pulled in there. The guy in the gray car stopped on the street where I stopped beside him. Kilo showed up headed the opposite way on the same street. Kilo got out of his Blazer and went to the gray car and talked to the guy. I don't know what they said. Kilo then reached into my Jeep and got the

black colored .357 revolver that I knew was inside. He took the gun and went back to the guy in the gray car. I then drove off and heard maybe four shots. We headed to Leavenworth and were arrested. The purpose of stealing the gray car was to strip it once we were in Kansas City. The gun used came from Kansas City where we have a lot of guns that I do not want to talk about."

Under the guidelines set forth in *State v. Hutchison*, 228 Kan. 279, 282, 615 P.2d 138 (1980), and *State v. Purdy*, 228 Kan. 264, 270-71, 615 P.2d 131 (1980), admission of Vincent's redacted statement was not error.

## Removal for Cause

Cox complains of a violation of his right of fundamental fairness under the Fourteenth Amendment because the trial court failed to remove four venirepersons for cause, thus giving the State more peremptory challenges than he had. Cox cites no authority for this proposition. The State points out and Cox concedes that only one of the four venirepersons was stricken with any of Cox's peremptory challenges. The other three had been stricken with challenges from the other defendants. All parties used all of their peremptory challenges.

Cox accepts that under current law, the trial court's failure to remove the venirepersons in question for cause does not violate his Sixth Amendment rights. Cox also agrees that the right to peremptory challenges is not a constitutional right. The fundamentally "unfair" argument was advanced in *State v. Crawford*, 255 Kan. 47, 53, 872 P.2d 293 (1994), although in the context of the Sixth Amendment right to an impartial jury. We did not find Crawford's argument persuasive, observing that he failed to show prejudice. 255 Kan. at 53.

Cox has not shown prejudice or fundamental unfairness. He does not identify any jurors he would have challenged peremptorily. We hold that Cox's constitutional rights under the Fourteenth Amendment were not violated.

## The Stolen Vehicles

Cox joined in a pretrial motion in limine to bar the State from presenting any evidence that the vehicles were stolen. The trial

court denied the motion. The State argued that the evidence was admissible as part of the res gestae and under K.S.A. 60-455, as evidence of plan or motive. At trial, counsel for the defendants joined in objections when the State offered the oral testimony of Chief Pickman of the Atchison Police Department. Chief Pickman testified that the police ran routine vehicle registration and ownership checks on the vehicles the afternoon of the killing. The defendants' objections were that the allegation of vehicle theft was highly prejudicial, based on uncharged conduct, and that the testimony was hearsay not falling within any exceptions, including "business" exceptions. The trial court overruled the objections and allowed the testimony, saying that "it's in the official course of business." Chief Pickman then testified that the checks revealed the Jeep and two black Blazers had been stolen late on the night of July 29, 1993, or early on July 30, 1993. The trial court did require the State to provide some foundation testimony, and Chief Pickman testified about the usual procedure involved in checking the ownership and registration of a vehicle.

Cox argues that the business records exception to the hearsay rule, K.S.A. 60-460(m), does not apply because Pickman's testimony concerning the vehicle checks was oral and, in addition, the testimony lacked proper foundation. We agree.

K.S.A. 60-460(m) provides:

"Evidence of a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated, is hearsay evidence and inadmissible except:

. . . .

"(m) *Business entries and the like*. Writings offered as memoranda or records of acts, conditions or events to prove the facts stated therein, if the judge finds that (1) they were made in the regular course of a business at or about the time of the act, condition or event recorded and (2) the sources of information from which made and the method and circumstances of their preparation were such as to indicate their trustworthiness."

The State contends that the business records exception applied and argues that Cox failed to preserve this issue for appeal because Cox failed at trial to make any objection to the fact that the testimony was oral, not written, and lacking foundation.

At trial, Cox did make a timely objection on the grounds of hearsay and lack of an applicable exception to the hearsay rule. Since Pickman's testimony was oral, it did not fall within the exception provided at K.S.A. 60-460(m), which expressly applies only to "writings." No other exception appears to apply. Although the trial court viewed Pickman's testimony as "in the official course of business," the testimony cannot fit within K.S.A. 60-460(m). Cox's stated grounds for the objection, that no hearsay exception applies, is sufficient to preserve the issue for appeal.

In *Letcher v. Derricott,* 191 Kan. 596, 603-04, 383 P.2d 533 (1963), we upheld the exclusion of a page of a filed police report of an investigation of an accident, which consisted of statements made by independent witnesses to the accident. Judge Spencer A. Gard, in commenting on *Letcher*, observed:

"Such statements, even though embodied in the report, could hardly have been admissible under any rule of hearsay exception heretofore operating in Kansas. If the new evidence rules had been in operation it is possible that the statements might come in if they met the conditions of the hearsay exception in Kan. Sess. Laws 1963, ch. 303, §60-460(d)(3), or, if the defendants were in court and subject to cross-examination with respect to their out-of-court statements; but not merely because they were a part of someone's official report." Gard, *Survey of Kansas Law: Evidence,* 12 Kan. L. Rev. 239 n.4 (1963).

None of the conditions described by Judge Gard apply to the instant case. We view the admission of Pickman's testimony as harmless error.

" 'Errors that do not affirmatively cause prejudice to the substantial rights of a complaining party do not require reversal when substantial justice has been done.' " *State v. Johnson,* 255 Kan. 140, 148, 871 P.2d 1246 (1994) (quoting *State v. Peltier,* 249 Kan. 415, 426, 819 P.2d 628 [1991], *cert. denied* 505 U.S. 1207 [1992]); see K.S.A. 60-261.

Although the trial court erroneously admitted evidence that the vehicles were stolen, there was independent evidence of that fact. Wheeler's attorney asked and Wheeler answered during his direct testimony which occurred after Chief Pickman's testimony:

"Q: Now, were you aware—did you drive any of the vehicles coming to Atchison?

"A: Yes.

"Q: Were you aware that the car you were driving or anybody else's car was stolen?

"A: I had no idea that the cars were stolen until I reached Leavenworth, some gas station somewhere in Leavenworth."

During the State's cross-examination, Wheeler testified that he gave someone whose name he did not know $10 for the two-door black Blazer in Kansas City on the night before the trip to Atchison. Wheeler realized this vehicle was stolen when he noticed different tags on the front and back while they were at a gas station in Leavenworth before arriving in Atchison. Also, the steering wheel had a towel wrapped around it, which to Wheeler was a sign of theft.

The State argues that the hearsay evidence the vehicles were stolen was admissible under K.S.A. 60-455 as "preparation" or "plan" evidence. Cox contends that K.S.A. 60-455 also bars admission of Chief Pickman's testimony. The trial court did not admit Pickman's testimony under 60-455; consequently, we need not conduct a 60-455 analysis. Although not asserted by the State, we acknowledge that *State v. Davis*, 256 Kan. 1, 22, 883 P.2d 735 (1994), approved as res gestae evidence that a vehicle was stolen. The problem in applying *Davis* to this case lies with the development of the theft evidence at Cox's trial. In *Davis*, Prendergast, the owner of the stolen vehicle, testified at trial, consequently, hearsay was not at issue. 256 Kan. at 18, 21. We note the record reflects in the instant case that the State endorsed witness names identified as owners of the stolen vehicles. No owner testified. A proper hearsay objection is not cured by applying the res gestae label.

### Sentencing

The trial court sentenced Cox to life imprisonment on the felony-murder conviction, upward departures of 102 months for the aggravated robbery, and 26 months for the conspiracy to commit robbery, all terms to be served consecutively. At the K.S.A. 1993 Supp. 21-4718 hearing on the State's motion for upward departures, the State asserted the aggravating factor of "an excessively brutal killing."

Cox argues that under K.S.A. 1993 Supp. 21-4716(b)(2)(B), only his conduct should be considered for sentencing purposes. He reasons that aider and abettor liability should not be used for a sentencing departure. Cox also contends that the excessive brutality—the killing—did not occur during the commission of the offenses for which departure was granted: aggravated robbery and conspiracy to commit robbery.

The trial court explained the upward departures by stating in part:

"But from the overall scene and the overall picture, you were all in it together because of the way you drove up here, because of the way you changed cars and had conversations beforehand, because of the way that in the testimony of one of the witnesses you kind of had Marcus Smith hemmed in there to where he couldn't do anything before anything occurred to him.

"And then when you left there, that you all remained together in the vehicles and even stopped on the way down to Leavenworth and that which indicates all of it that you were really all in it together.

. . . .

"So the Court finds really that you're just as equally as guilty as any of the rest of them.

"I think that this kind of a killing was as brutal a killing really as you could ever have on any kind of shooting.

"It was worse than really kind of what we call a drive-by shooting because of the fact that the evidence was this, that they got the guy out and had him go down to the ground and then start pulling the trigger.

"Why, as the prosecution said in their opening statement, it wasn't just a brutal killing, it was an execution.

"And that's exactly what it was in this particular case."

As required by K.S.A. 1993 Supp. 21-4716(a), the trial court stated on the record what it considered the substantial and compelling reason for departure to be, the brutal nature of the killing.

K.S.A. 1993 Supp. 21-4721 provides for appellate review of a departure sentence:

"(d) In any appeal from a judgment of conviction imposing a sentence that departs from the presumptive sentence prescribed by the sentencing grid for a crime, sentence review shall be limited to whether the sentencing court's findings of fact and reasons justifying a departure:

"(1) Are supported by the evidence in the record; and

"(2) constitute substantial and compelling reasons for departure.

. . . .

"(f) The appellate court may reverse or affirm the sentence. If the appellate court concludes that the trial court's factual findings are not supported by evidence in the record or do not establish substantial and compelling reasons for a departure, it shall remand the case to the trial court for resentencing."

Our review of a departure sentence is a question of law. Departure factors are to be reviewed to determine whether there is substantial evidence supporting the trial court's findings or whether the findings are clearly erroneous. *State v. Gideon*, 257 Kan. 591, Syl. ¶ 20, 894 P.2d 850 (1995).

Substantial evidence is such legal and relevant evidence as a reasonable person might accept as sufficient to support a conclusion. *State v. Ratley*, 253 Kan. 394, Syl. ¶ 2, 855 P.2d 943 (1993).

We described the legislative history of the KSGA in *State v. Grady*, 258 Kan. 72, 89, 900 P.2d 227 (1995).

The Senate Judiciary Committee observed, in part, when considering the KSGA:

"[T]he Committee recognized that the guidelines are designed to regulate judicial discretion, not to eliminate it. The guidelines contemplate that a typical offense and offender will be sentenced within the guidelines. For an individual somewhat more or less culpable than a typical offender, the court may choose a sentence at the top or bottom of the applicable guideline. However, when the individual is substantially more or less culpable than the typical offender, the court may consider a departure." Minutes of the Senate Committee on Judiciary, p. 2, January 24, 1992.

The court's comments at the time of sentencing govern as to the reasons for departure. *Gideon*, 257 Kan. 591, Syl. ¶ 21.

K.S.A. 1993 Supp. 21-4716(b) provides in relevant part:

"(2) Subject to the provisions of subsection (b)(3), the following nonexclusive list of aggravating factors may be considered in determining whether substantial and compelling reasons for departure exist:

. . . .

"(B) *The defendant's conduct during the commission of the current offense* manifested excessive brutality to the victim in a manner not normally present in that offense."

"(3) If a factual aspect of a crime is a statutory element of the crime or is used to sub-classify the crime on the crime severity scale, that aspect of the current crime of conviction may be used as an aggravating or mitigating factor only if the criminal conduct constituting that aspect of the current crime of conviction is

significantly different from the usual criminal conduct captured by the aspect of the crime.

"(c) In determining aggravating or mitigating circumstances, the court shall consider:

(1) Any evidence received during the proceeding;

(2) the presentence report;

(3) written briefs and oral arguments of either the state or counsel for the defendant; and

(4) any other evidence relevant to such aggravating or mitigating circumstances that the court finds trustworthy and reliable." (Emphasis added.)

Accessories or aiders and abettors may be charged with and convicted of a crime as principals. K.S.A. 1993 Supp. 21-3205; *State v. Kliewer*, 210 Kan. 820, 823, 504 P.2d 580 (1972).

The comments at Cox's sentencing show that the trial judge found that the codefendants' actions showed they "were all in it together." The trial judge reasoned they were all equally responsible for what happened because of how the robbery occurred: the planning beforehand, the surrounding of the victim's vehicle, and the group escape with the victim's vehicle, although only one person pulled the trigger.

We have not yet addressed the issue of whether 21-3205 aider and abettor liability alone can be used to impute a substantial and compelling aggravating factor for upward departure in sentencing under K.S.A. 1993 Supp. 21-4716(b)(2)(B). Courts in Washington and Minnesota have considered the question, although in cases factually distinguishable from this case. See *State v. Hawkins*, 53 Wash. App. 598, 606, 769 P.2d 856, *rev. denied* 113 Wash. 2d 1004 (1989) ("[The defendant] claims that there was no solid evidence indicating his involvement as anything more than an accomplice to murder. However, 'we will not split hairs' in an effort to determine the greater or lesser roles of these three participants."). The record in *Hawkins* contained conflicting evidence of Hawkins' direct involvement in the murder. However, the court observed that the victim

"had been severely beaten before he died in the fire. He suffered a depressed skull fracture that was consistent with a blow from a hammer or pipe. He also had seven broken backside ribs, a type of injury that requires considerably more

force than the use of a fist and is commonly seen in automobile accidents." 53 Wash. App. at 600.

Hawkins was implicated when his former wife reported to the sheriff's office that Hawkins told her

"that the group's plan to burglarize Couch's home went awry when Combs had a violent scuffle with the victim. [Hawkins] said he put the victim out of his misery by slitting his throat and created the appearance of an accident by wrapping Mr. Couch's legs in a blanket and setting fire to the trailer." 53 Wash. App. at 601.

Hawkins' exact role could not be determined. Thus, grounds existed for imposing the departure sentence based on the defendant's own conduct.

The Washington Supreme Court also has observed:

"Regardless of defendant's intent [not to harm the victim] and despite the fact that defendant was not present during the robbery and murder, the circumstances surrounding defendant's role in planning the crime, as explained by the sentencing court in its findings of fact and conclusions of law, justify imposing an exceptional sentence." *State v. Handley*, 115 Wash. 2d 275, 285-86, 796 P.2d 1266 (1990).

*Handley* is not a felony-murder case. Handley pled guilty to second-degree possession of stolen property, first-degree criminal assistance, and first-degree conspiracy to commit robbery.

The Minnesota Supreme Court has linked an aider and abettor's conviction of second-degree murder and conspiracy to commit first-degree murder to sentencing:

"There is evidence that defendant gratuitously maced the victim, an action we have previously recognized as indicating cruelty. [Citation omitted]. Further, even if defendant did not inflict the brutal injuries and psychological terror which proceeded and were part of the murder, as a participant she was legally responsible for these actions under Minn. Stat. § 609.05 (1984). [Citation omitted.]" *State v. Campbell*, 367 N.W.2d 454, 461 (Minn. 1985).

The victim in *Campbell* had less than normal mental capabilities. Her throat had been cut from ear to ear, and her chest and back had been stabbed 17 times. The evidence was conflicting as to Campbell's specific involvement beyond macing the victim, conduct the Minnesota court viewed as showing cruelty.

Interpretation of a statute is a question of law. *State v. Donlay*, 253 Kan. 132, Syl. ¶ 1, 853 P.2d 680 (1993). Under the funda-

mental rule of statutory construction, the intent of the legislature governs when intent can be determined from the statute. *State v. Adee*, 241 Kan. 825, 829, 740 P.2d 611 (1987). When a statute is plain and unambiguous, we must give effect to the intention of the legislature rather than decide what the law should or should not be. *Martindale v. Tenny*, 250 Kan. 621, Syl. ¶ 2, 829 P.2d 561 (1992). "The general rule is that a criminal statute must be strictly construed in favor of the accused, which simply means that words are given their ordinary meaning. Any reasonable doubt about the meaning is decided in favor of anyone subjected to the criminal statute." *Donlay*, 253 Kan. 132, Syl. ¶ 3. This rule of strict construction, however, is subordinate to the rule that judicial interpretation must be reasonable and sensible to effect legislative design and intent. *State v. Tyler*, 251 Kan. 616, Syl. ¶ 15, 840 P.2d 413 (1992).

The language in K.S.A. 1993 Supp. 21-4716(b)(2)(B) focuses the sentencing court's attention on the defendant's own individual conduct during the commission of the current offense when considering the imposition of a departure sentence.

A defendant's degree of involvement in criminal acts by others will vary. A defendant may be the driver of the getaway car in a bank robbery, waiting outside the bank, never seeing any of the "excessively brutal" acts the partner commits inside the bank during the robbery. In contrast, the defendant may brutally beat a robbery victim until the victim is near death, but the partner may fire the bullet that kills the victim. As in *Hawkins*, 53 Wash. App. at 606, it may be difficult to decide who among a group of defendants committed the excessive brutality during a crime involving the entire group.

Here, we concentrate for sentencing on Cox's individual involvement. Cox knew of the plan to rob the victim. Cox knew the victim's car was to be taken back to Kansas City and stripped. He parked his Jeep next to the victim's car. He knew the murder weapon was in the Jeep. He watched Hayes take the weapon and use it on the victim. Cox left the scene with the others at the time of the shooting. Cox had control of the murder weapon before Kilo took it. Cox parked his vehicle so that the weapon was accessible to Kilo.

Cox's actions placed and kept the victim in a position of vulnerability to the gunman. Cox could have interceded, but did not. Cox rendered no assistance to the victim after the shooting. However, the question is whether Cox's conduct manifested excessive brutality to the victim in a manner not normally present in the offense. Cox had no physical, or apparently verbal, contact with the victim. He did not shoot the victim. Cox will be punished by the appropriate sentence for each of his three convictions.

We hold that Cox's conduct did not amount to "excessive brutality" to the victim. We reject the idea that aider and abettor liability alone is to be used as a basis for a sentence departure. Under K.S.A. 1993 Supp. 21-4716(b)(2)(B), only the defendant's individual conduct during the commission of the current offense is to be considered for a sentence departure. The triggerman, Michael Hayes (Kilo), was convicted on all three charges. Upward departures were imposed on the basis of excessive brutality. The application of aider and abettor liability to sentencing was not at issue in Hayes' case. See *State v. Hayes*, 258 Kan. 629, 908 P.2d 597 (1995).

We read K.S.A. 1993 Supp. 21-4716(b)(2)(B) to require conduct of a defendant "in a manner not normally present in that offense," *i.e.*, conduct going beyond what is minimally needed to satisfy the elements of the offense. Cox participated in the activities leading up to the killing, but the level of his participation did not go beyond what was needed to establish the elements for his convictions.

We also consider the relationship of the conspiracy charge and the upward departure on that count an additional rationale for our remand on sentencing. Is the nature of the killing properly an aggravating factor for the crime of conspiracy to commit robbery? We think not. "Conspiracy as defined by K.S.A. 21-3302 consists of two essential elements: (1) An agreement between two or more persons to commit or assist in committing a crime; and (2) the commission by one or more of the conspirators of an overt act in furtherance of the object of the conspiracy." *State v. Hill*, 252 Kan. 637, Syl. ¶ 1, 847 P.2d 1267 (1993). "All criminal offenses, except those considered continuing offenses, are committed when every act which is an element of the offense has occurred. . . . The

crime of conspiracy as proscribed in K.S.A. 21-3302 is not a continuing offense." *State v. Palmer*, 248 Kan. 681, 690, 810 P.2d 734 (1991).

In Cox's case, the conspiracy to commit robbery was completed at the time the robbery occurred. The aggravating factor, the "excessive brutality," did not occur until after the conspiracy had taken place. The object of the conspiracy, the robbery, resulted in the shooting. The overt act in furtherance of the object of the conspiracy could conceivably include Cox's actions during the carjacking which facilitated the killing. But the brutality of the killing applies to the substantive offense, not to the conspiracy.

The record is reviewed and it is held that under the facts of this case, the trial court's factual findings neither are supported by evidence in the record nor establish substantial and compelling reasons for an upward sentence departure. K.S.A. 1993 Supp. 21-4721.

We affirm the three convictions and the sentence for felony murder. We vacate the sentences for aggravated robbery and conspiracy to commit robbery and remand for sentencing with instructions to impose the appropriate sentences under the KSGA.

Because of our holding that upward departures in sentencing were not appropriate, we need not address Cox's contention that his total term of imprisonment was improperly determined.

Convictions affirmed, sentences vacated in part, and case remanded.