No. 72,074

STATE OF KANSAS, *Appellee*, v. MICHAEL S. HAYES, *Appellant*.
(908 P.2d 597)

Opinion filed December 8, 1995.

*Charles M. Tuley*, of Atchison, was on the brief for appellant.

*Allen A. Ternent*, county attorney, argued the cause, and *Patrick E. Henderson*, special prosecutor, and *Carla J. Stovall*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

SIX, J.: This case focuses on defendant's claim that his counsel was improperly restricted by the trial court in the voir dire examination of potential jurors.

Michael S. Hayes was convicted of first-degree murder, K.S.A. 1993 Supp. 21-3401; aggravated robbery, K.S.A. 1993 Supp. 21-3427; and conspiracy to commit robbery, K.S.A. 1993 Supp. 21-3302 and K.S.A. 1993 Supp. 21-3426. Hayes' counsel waived oral argument and submitted the case on the brief. Our jurisdiction is under K.S.A. 1993 Supp. 22-3601(b)(1) (an appeal from conviction of an off-grid crime). Hayes' appeal, along with *State v. Cox*, 258

Kan. 557, 908 P.2d 603 (1995), and *State v. Vincent*, 258 Kan. 694, 908 P.2d 619 (1995), arises from the July 30, 1993, carjacking and murder of Marcus Smith. Hayes was tried separately. Damon Cox, Carrie Vincent, Stefan Wheeler, and Jared Owens were tried together. The five defendants are referred to as the group.

We find no error and affirm.

## FACTS

The events surrounding Hayes' convictions are set out in *Cox*. Additional facts relating to the voir dire issues are referenced herein.

Neither Hayes nor Cox testified. Vincent, Wheeler, and Owens testified for the State; however, none said they witnessed the shooting.

The group sped away from the scene together in four cars (their three and the victim's). Hayes, then 17, was stopped by a police roadblock and taken into custody. He was certified to be tried as an adult. His counsel filed a pretrial motion to change venue due to extensive publicity. The trial court denied the motion three weeks before the case went to trial.

After the jury returned guilty verdicts, Hayes moved for a new trial, alleging that his motion to change venue should have been granted and that the trial court unduly restricted his voir dire of prospective jurors. The trial court denied the new trial motion.

## DISCUSSION
### Restrictions on Voir Dire

Hayes contends that the trial court unduly restricted voir dire, thus preventing his counsel from inquiring into the specific opinions of prospective jurors as to Hayes' guilt or innocence. Hayes also asserts that in imposing the voir dire restrictions, the trial judge made disparaging comments about his counsel. Hayes claims the restrictions on questioning violated his right to an impartial jury and prevented him from supporting a motion to change venue. The disparaging comments about his counsel, he contends, deprived him of a fair trial.

The purpose of the voir dire examination of prospective jurors is to enable the parties to select competent jurors who are without bias, prejudice, or partiality. See *State v. Lumbrera*, 252 Kan. 54, 59, 845 P.2d 609 (1992).

A trial court should not be satisfied in all cases with a one-size-fits-all approach to voir dire. Answers should not necessarily be limited to "stock questions" such as "Have you formed an opinion as to the accused's innocence or guilt?" or "Will you be able to determine guilt based only on the evidence presented?" *United States v. Affleck*, 776 F.2d 1451, 1455 (10th Cir. 1985). Answers to such questions do, of course, go to the heart of the inquiry and are given under oath and therefore deserve a heavy presumption of correctness. Nevertheless, it is conceivable that prospective jurors with the purest of intentions may, in the heat of the moment in front of their peers, underestimate their own bias. Consequently, " '[c]onsiderable latitude should be allowed counsel in the examination of jurors, so that all who have bias or prejudice, or are otherwise disqualified, may be eliminated.' " *State v. Lockett*, 232 Kan. 317, 321, 654 P.2d 433 (1982) (quoting *Swift v. Platte*, 68 Kan. 1, 6, 72 Pac. 271, *rev'd on rehearing* 68 Kan. 10, 74 Pac. 635 [1903]). Ultimately, whether ruling on challenges for cause or the scope or extent of questioning, trial courts should consider special circumstances that may be present.

Our standard of review is abuse of discretion. We have repeatedly recognized that the trial court has broad discretion in controlling voir dire in criminal cases. See, *e.g.*, *Lumbrera*, 252 Kan. 54, Syl. ¶ 4. K.S.A. 22-3408(3) describes the procedure for examining prospective jurors in a criminal trial. The appropriate scope and extent of voir dire may vary greatly from case to case and therefore is not governed by any fixed rules. *Lockett*, 232 Kan. at 322. Deference to trial court discretion has been called the hallmark of this court's resolution of voir dire issues in criminal cases. 232 Kan. at 323.

Under our general definition, judicial discretion is abused when the action taken is arbitrary, fanciful, or unreasonable. If reasonable persons could differ as to the propriety of the action taken by

the trial court, then it cannot be said that the trial court abused its discretion. *Lumbrera*, 252 Kan. 54, Syl. ¶ 5.

Jury selection in this case began with a large group of prospective jurors. There was no exact count of the full assembly. However, their numbers were large enough to create a problem of insufficient seating in the courtroom at the start of the proceedings.

The clerk called 39 names, and those people, whom we refer to as panelists, were directed to sit in the jury box. One of the first 39 panelists was immediately excused for cause based on comments he had made in a written questionnaire. The clerk called a new person to replace the one excused. The remaining prospective jurors (not on the panel of 39) sat in the courtroom and observed the proceedings.

The closeness of the community was apparent from the record. Of the 39 panelists, 11 said that they knew the county attorney who was prosecuting the case, and 12 said that they knew the defense attorney. None of those people were dismissed for cause for that reason, as they all said that their relationships would not cause them to be biased in favor of or against either party. Three persons were excused for cause because they were friends of the victim's family; one was excused because his brother-in-law witnessed the crime; and another was excused who said her brother was the ambulance driver who responded to the scene.

The panelists were sworn for voir dire examination, and the trial judge made opening comments.

The State commenced its voir dire. By the end of the State's voir dire, the trial judge had excused 10 panelists for cause. Three of the excused panelists were close friends of the victim's family; four said that they had a predisposition about the case and did not believe they could put it aside; and the three others had personal reasons that would have prevented them from being attentive or impartial. Each time a panelist was excused for cause, a new panelist was selected from the supply of prospective jurors in the courtroom. The prosecutor would then bring the new panelist "up to speed" by asking all of the questions that had already been put to the panel. The State eventually passed the panel for cause.

We turn now to the specific contentions advanced by Hayes. At issue on appeal are statements and rulings of the trial court during the voir dire. Although Hayes complains of "repeated interruptions and comments," the record shows that Charles M. Tuley, Hayes' counsel, conducted voir dire on many subjects without interruption, including: (1) the presumption of innocence; (2) the fact that police can make mistakes; and (3) whether (a) race would be a factor in a juror's mind, (b) anyone had been a victim of crime, (c) anyone had served on a jury before, and (d) anyone had relatives in law enforcement.

The first interruption from the judge came when Tuley asked a panelist whether it would make a difference if Hayes did not testify. The trial judge stated, "Well, I hate to stop you there . . . , jurors don't know all the law respecting that," and went on to instruct the panelists that a defendant has a right not to take the stand. The judge also informed the jurors that they would be instructed not to take such an event into consideration in determining guilt or innocence.

Tuley then asked the panelists a series of leading questions, such as "[Y]ou're expecting me, on behalf of Michael, to do something, right?" and "You expect me to call some witnesses or to put on some evidence?" At that point, the trial judge again intervened and instructed the jury that the defendant has a presumption of innocence and that the State has the burden of proving the defendant guilty beyond a reasonable doubt. The trial court gave a mild reprimand to Tuley, suggesting that Tuley tried to "lead the prospective juror" to a conclusion contrary to law by "saying what [the juror] felt." The trial judge concluded the interruption by stating, "I don't mean to interfere with your examination in any way. Please continue. You're doing a fine job."

We find no abuse of discretion in the trial court's comments.

Later, when Tuley asked the panel whether any of them had "formed any opinion about anything in this case," the trial court again interjected comments about how it is natural to form opinions whenever one has read anything or has seen something on television. These comments were unnecessary. Tuley's question

was not objectionable or unclear, but it is an overstatement to say that the judge's comments were prejudicial or disparaging.

Tuley then asked the jury, "Without telling me what your opinion is—because I really don't care—has anyone formed an opinion, whatever it may be, about this?" Tuley noted at least 10 affirmative responses among the panel of 39. Of those recognized as responding, only four ended up as actual jurors.

The trial judge responded at this point, clarifying his position by saying, "I'm not saying that you can't get involved in opinions." The judge explained that the firmness or intensity of prospective jurors' opinions—whether they have a "definite opinion that it's going to take some evidence to do away with"—is a proper subject of inquiry. The trial court expressly ruled, however, that it would not allow Tuley to ask the prospective jurors what their specific opinions were.

Hayes contends that the trial court erred in restricting questioning about the substance of prospective jurors' opinions. He asserts that such questioning should be allowed "to determine if there is sufficient prejudice to dismiss a panel member or even change venue." Hayes claims that preventing Tuley from inquiring into specific opinions eliminates "the entire basis for voir dire."

The State argues that the trial court correctly restricted inquiry into the specifics of predispositions because such questioning serves no "useful purpose." See K.S.A. 22-3408(3). "The pertinent inquiry," the State reasons, "is whether the juror can put aside his preconceived notions and decide the case on the evidence and instructions given."

The trial court explained its restriction by suggesting that it was concerned Tuley might use such information to later argue that the trial was not fair.

There are several reasons not mentioned by the trial court that support a decision to restrict inquiry into the specific opinions of prospective jurors as to guilt or innocence. First, as the State contends, the answers are not really pertinent to the ultimate question of impartiality—whether prospective jurors can put aside any predispositions and judge the case fairly, based on the evidence. Second, the answers by those who have formed opinions may influence

other prospective jurors who may not have formed opinions about the case. Third, asking a prospective juror specifically whether he or she believes the defendant to be guilty or innocent may be perceived by the juror as "tending to exact a pledge" from the juror. See *State v. King*, 718 S.W.2d 241, 246 (Tenn. 1986).

Also, it should be noted that the limitation imposed on Tuley by the trial court did not prevent counsel from exploring the sources of information that prospective jurors had read, seen, or heard, which may have provided insight as to the direction of jurors' leanings, if any.

The Eleventh Circuit has held that a trial court did not err in refusing to allow defense counsel to ask two prospective jurors "which way they were leaning" after they said that they "had a leaning in one direction or another." *Wilcox v. Ford*, 813 F.2d 1140, 1150 (11th Cir.), *cert. denied* 484 U.S. 925 (1987). In *King*, the Tennessee Supreme Court held that a trial court properly restricted counsel from asking a prospective juror, "[I]f you had a vote right now, how would you vote?" 718 S.W.2d at 246. We agree with the holdings in *Wilcox* and *King*.

We conclude that the trial court did not act arbitrarily, fancifully, or unreasonably in restricting Tuley's inquiry into the specific opinions of prospective jurors as to Hayes' guilt or innocence.

Voir dire continued after the trial court explicitly ruled that Tuley could not ask about specific opinions. Tuley cites two more examples of what he considers error or misconduct by the trial court.

First, Tuley continued to press the trial court on its ruling about specific opinions, arguing, "I think I have a right to ask them their opinion right now whether they believe my client is guilty or innocent or anything else about this case." The trial court granted Tuley some leeway and said he could ask the panelists "[i]f they have a definite opinion as to the fact that they think your client is guilty at this particular time." It is difficult to tell what the trial court meant by "definite" opinions.

The questioning continued:

"[MR. TULEY:] You guys all remember who raised your hand awhile ago when I asked if you had an opinion about the case? Ms. McKenzie, you had an opinion? You didn't have. Ms. Seever had an opinion?

"VENIREMAN PATRICIA A. SEEVER: Right.

. . .

"MR. TULEY: What's your opinion about this case, Ms. Seever?
"THE COURT: Well,—
"VENIREMAN PATRICIA A. SEEVER: My thought? There was stolen cars. There was a dead person in the middle of daylight. Somebody did it. And it needs to be proven that it wasn't him.
"MR. TULEY: If I can prove that it wasn't him?
"VENIREMAN PATRICIA A. SEEVER: They arrested him. That's who was. They got him in the car. You have to prove that he was.
"MR. TULEY: Sure. That's your opinion?
"VENIREMAN PATRICIA A. SEEVER: I don't think that he's guilty. I don't know that.
"MR. TULEY: I appreciate your honesty. I do.
"THE COURT: Well, ma'am, here again, I think with the adroit questioning by Mr. Tuley, partly, but the way you put your answer there, you said that he'd have to prove that he didn't do it. Actually, the State has to prove that he did do it. He doesn't have to prove that he didn't do it. And I think that's probably what you meant. But you put it in a little different way, that he would have to prove his innocence, or words to that effect. He doesn't have to prove his innocence. The State has to prove him guilty beyond a reasonable doubt. Please proceed, Mr. Tuley."

Ms. Seever did not serve on the jury. She was struck by one of Hayes' 13 peremptory challenges.

Tuley contends that the trial court's comments about the "adroit questioning of Mr. Tuley" were prejudicial and improper because they suggested to prospective jurors that Tuley was using "chicanery." Hayes' assertion is not persuasive. While we are unable to massage a written record to produce a trial judge's vocal intonation for our review, we can observe the distance in meaning between "chicanery" and "adroit."

Next, Hayes challenges the trial court's interruption in the voir dire of prospective juror Nottingham, who said that he had "formed an opinion." The trial court responded that it was natural to have an opinion based on what one has read or seen, but that the key is to "try to be as fair as possible." The trial court did not remove Nottingham for cause because Nottingham said he would "try to do my best" to be impartial. Nottingham did not serve on the jury.

Hayes does not assert error in refusing to remove Nottingham for cause. Such a contention would be futile because Nottingham did not serve on the jury. See *State v. Rainey*, 233 Kan. 13, 15, 660 P.2d 544 (1983). Instead, he contends he was prejudiced because the trial court's interjections could have convinced other prospective jurors that "any bias they had at that time was not worth mentioning."

When considered in context of the entire voir dire, we do not think the trial court's comment was prejudicial. Prospective jurors were informed initially that if any juror had a "definite opinion as to the outcome of the case . . . we want your honesty in that respect." The trial court removed four jurors for cause in whole or in part because they stated they had a firm predisposition about the case. The only line of questioning that the trial court limited concerned the specific content of the prospective jurors' opinions. Tuley was not restricted from inquiring into the sources of possible bias or into the firmness or extent of the panelists' predispositions.

Hayes' claim that he was prevented from supporting a motion to change venue is not confirmed in the record. Hayes' venue motion was denied 3 weeks before trial. Hayes did not renew his venue motion, file a new motion, or move the trial court to reconsider. If Hayes had no venue motion pending at the time of voir dire, it is hard to understand how the trial court prejudiced any such motion. Hayes asserts the claim for the first time on appeal, which precludes its consideration. See *State v. Johnson*, 253 Kan. 75, 91, 853 P.2d 34 (1993).

### Special Appellate Review

Finally, we note Hayes' contention that he is entitled to special appellate review privileges under K.S.A. 1993 Supp. 21-4627. The State does not respond. Hayes first makes a general request "that the judgment of conviction be reviewed for errors asserted and errors unassigned as provided in K.S.A. [1993 Supp.] 21-4627." Hayes is asking us to conduct a blanket search of the record for any "unassigned" reversible errors which may have occurred. The request is not well taken. K.S.A. 1993 Supp. 21-4627 does not apply to Hayes' appeal. The special review provisions of 21-4627 were

enacted when the legislature created the hard 40 sentence. See L. 1990, ch. 99, § 7. Although the legislature did not define the phrase "mandatory term of imprisonment," the phrase appears in the Kansas statutes only in connection with the hard 40. See K.S.A. 1993 Supp. 21-4622 through 21-4630. The legislature intended K.S.A. 1993 Supp. 21-4627 to apply only when the hard 40 has been imposed. The 1994 amendment to 21-4627 limits the application of the special review provisions to death penalty cases. See L. 1994, ch. 252, § 5.

Hayes was convicted under K.S.A. 1993 Supp. 21-3401 and given a life sentence. Because he was 17 when the offense was committed, Hayes could not and did not receive a 40-year mandatory term of imprisonment. K.S.A. 1993 Supp. 21-4622.

Affirmed.