NOT DESIGNATED FOR PUBLICATION

No. 117,554

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

CARLOS J. MIERA,
*Appellant*.


MEMORANDUM OPINION

Appeal from Wyandotte District Court; BILL KLAPPER, judge. Opinion filed February 15, 2019.
Affirmed.


*Jennifer C. Roth*, of Kansas Appellate Defender Office, for appellant.


*Kayla Roehler*, assistant district attorney, *Mark A. Dupree Sr.*, district attorney, and *Derek Schmidt*, attorney general, for appellee.


Before GREEN, P.J., PIERRON and BUSER, JJ.


BUSER, J.:  This is a direct appeal by Carlos J. Miera upon his conviction for aggravated criminal sodomy, an off-grid person felony in violation of K.S.A. 2017 Supp. 21-5504(b)(1). Miera raises four issues. First, he contends the State erred when it asked impermissible questions during voir dire. Second, he asserts the district court erred in instructing the jury about the elements of the offense of aggravated criminal sodomy. Third, he argues there was insufficient evidence to support the conviction. Finally, he claims these three errors cumulatively deprived him of a fair trial. Upon our review, we

1

conclude that Miera has not shown reversible error and, as a result, we affirm the conviction.

## FACTUAL AND PROCEDURAL BACKGROUND

In March 2016, Corey Hand went across the street to Mary Agee's house. Six people lived in the house, including Miera. Hand went to see his best friend, Rusty Potter. According to Hand, "I went over there because I was supposed to wake [Potter] up because we were supposed to go to work that night. I went inside to talk to [Agee]. [Agee] had me go downstairs and tell everybody that she was unable to do dinner because the meat was unthawed." Hand testified, "I went downstairs, I told Savannah that her mom was unable to do dinner." Savannah, who was 16 years old, was in the living area of the basement watching television. Potter was sleeping in another room.

According to Hand, he went to a back room. The room was partitioned from the rest of the living area by a curtain. Hand knocked on the frame of the curtained doorway three times. He testified, "After the third knock, I went in and I seen [*sic*] [Meira] and [A.H.]"

At the time of the incident, A.H. was 4 years old and Miera was 34 years old. A.H. is the daughter of S.C. At the time, S.C. and Meira were dating. S.C. is Agee's daughter.

After knocking, Hand entered the room and saw Miera "slouched up against the wall on the bed and [A.H.] was leaning over him and he had his shorts pulled down." According to Hand, "I seen [*sic*] [A.H.'s] mouth around [Miera's] penis." Hand testified that A.H. "looked at me as soon as I walked in and that's when her mouth had came [*sic*] off of it." A.H. and Hand were acquainted with each other. Hand observed that Miera's penis was circumcised and not fully erect.

Hand testified that Miera "hid his face in shame, started cussing at himself and hid his face in the pillow when I caught him." Hand recalled that Meira said, "[O]h shit. [Expletive]." According to Hand, Miera "looked drunk. I could tell he was, he was slurring with his voice, his eyes were red and low and there [were] beer cans." Hand told Miera that dinner would not be ready. When asked why he did not say or do anything else, Hand responded, "I didn't want to risk anything."

Agee testified that when Hand returned upstairs his demeanor was "[s]hock, disbelief, couldn't believe what he was seeing, anger." Agee recalled that Hand told her to wake up her son, Potter, and call the police because he had seen A.H.'s mouth around Miera's penis. Agee did not want Hand and her son, Potter, to confront Miera because he had been drinking. Agee called S.C. on her phone and asked Hand to tell her what he had observed. Agee did not call the police. She testified that calling the police was S.C.'s "job to do." At some point, Agee saw Miera leave the residence.

The next morning, Children's Mercy Hospital contacted the police to report that a suspected sexual assault occurred involving A.H. Kara Latessa, a sexual assault nurse examiner at the hospital, testified that her clinical examination of A.H. revealed no sexual injury. According to Latessa, most exams she conducts are normal. She was unable to tell if there had been any sexual activity between A.H. and another person. Shannon Brink, with the Kansas Bureau of Investigations Forensic Laboratory, performed DNA testing on samples taken from A.H.'s sexual assault examination. Brink found no evidence of seminal fluid or saliva.

After the clinical examination, A.H. left with her grandmother G.H. G.H. lived with her son P.H., who is A.H.'s father. G.H. testified that she had never seen A.H. pull on P.H.'s shorts. P.H. said that A.H. never pulled at or tugged on his shorts while he was wearing them.

3

Detective Heron Santana with the Kansas City Police Department interviewed Hand and Agee. The detective also arrested Miera at his mother's residence. Upon taking Miera into custody, Detective Santana recalled:

> "I just told him that he was going to get booked into the county jail and that Detective Irwin with the child abuse unit was going to speak with him the following morning, and he told me, um, I didn't do anything, I was on my bed and [A.H.] was jumping on top of me. I was asleep and she was tugging on my pants."

Detective Jeff Irwin with the Kansas City Police Department also interviewed Hand. According to the detective, he emphasized the seriousness of the allegations that Hand had reported. Detective Irwin testified, "[Hand] says I understand, I know and I saw what I saw and he said a hundred percent he did see the juvenile's mouth was on Mr. Miera's penis. . . . [H]e didn't believe it was erect, but he did recall that it was circumcised and he could see pubic hair." Hand informed the detective that he was a family friend of Miera's and there was "no reason to get him in trouble."

Detective Irwin also interviewed Miera. A portion of that interview was played for the jury but it is not included in the record on appeal. The detective testified that Miera told him that during the incident he had pushed A.H. away by pushing her in the chest.

At the jury trial Miera testified in his own defense. The day of the incident, Miera testified that five persons (including himself and A.H.) were in the basement area. By Miera's account, prior to arriving at Agee's house, he had drunk three or four beers in a span of two hours. Upon going to the basement, Miera recalled:

> "I say hi to everybody and [A.H.] comes running up of the room [*sic*] saying Carlos, Carlos, I knew you'd come back, you know? I'm giving her a hug, and I'm now in the— downstairs in the little rec area for about, I don't know, a minute or so, you know, and still saying hi, you know, watching TV just a little bit, and then I go back into the room

4

and before I enter the room I take my black pants off, because I had my black pants over my [basketball] shorts."

At the time, Miera claimed he was not intoxicated. Miera testified he laid partially on the bed "propped up in a slouched position." According to Miera, "I just lay down, you know, playing on my phone watching [A.H.], you know . . . . I was dozing in and out." During this time, Miera testified that A.H. was watching television and going back and forth from the back room to the "rec area" about four or five times during a 5- to 10-minute period. When A.H. would return to the back room, Miera testified that she would jump on him and he "would just push her away." According to Miera, A.H. would say, "Carlos, wake up, you know, and I was like, I'm not sleeping, [A.H.]."

Miera testified that he did not hear a knock on the door frame prior to Hand entering the room. According to Miera:

"[W]hen [Hand] walked in, that's when I was pushing [A.H.] away from me.
    . . . .
    "And she was holding onto me.
    . . . .
    "And when she was doing this and I pushed her away she kept going to my pants, and when I felt them come down a little bit I propped up and I was like, what the hell? I go like that real quick and that's when [Hand] walked in and we made eye contact, you know, and he gave me the big eyes, you know, like, like what just happened, you know? . . .
    . . . .
    "But he didn't say nothing, me and him [*sic*] locked eyes and he stood there for about a minute or so then he walked out."

Meira denied Hand's account that he uttered any profanity or expletive.

According to Miera, "I don't think it was, but it is a possibility" that Hand was able to see his penis when A.H. pulled down his shorts. After the incident, Miera left the house because he had to pick up S.C. from work. Meira testified that after the incident he never talked with Hand about it.

After deliberations the jury found Meira guilty of aggravated criminal sodomy, an off-grid person felony in violation of K.S.A. 2017 Supp. 21-5504(b)(1). Miera moved for a new trial. The district court denied the motion. He was sentenced to an off-grid sentence of life imprisonment—with a hard 25 years in prison before being eligible for parole. Miera timely appeals.

PROSECUTORIAL ERROR DURING VOIR DIRE

Miera's first issue is that the prosecutor committed reversible error

"by asking the jury panel during voir dire about specific facts present in this case. Because these statements improperly attempted to argue the case and elicit the jury panel's pre-judged decision on the issues in the case, they were outside the wide latitude typically given to prosecutors during a case and prejudiced Mr. Miera, depriving him of a fair trial."

The State counters that instances of purported improper questioning were, in fact, appropriate because they addressed issues of bias, prejudice, or impartiality.

The purpose of voir dire is to enable the parties to select jurors who are competent and without bias, prejudice, or partiality. As a general rule, the nature and scope of the voir dire examination is left to the sound discretion of the trial court. However, in deciding whether the trial court has taken sufficient measures to ensure that the case is

6

tried by an impartial jury free from outside influences, appellate courts have the duty to make an independent evaluation of the circumstances. *State v. Woods*, 301 Kan. 852, 870, 348 P.3d 583 (2015) (quoting *State v. Reyna*, 290 Kan. 666, 686, 234 P.3d 761 [2010]).

To evaluate claims of prosecutorial error, appellate courts use a two-step process: First, the court determines whether any error occurred and, if so, determine whether there was prejudice. *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016). In determining whether prosecutorial error occurred, our court "must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial." 305 Kan. at 109.

If error is found, our court moves to the second step and determines whether the error prejudiced the defendant's due process rights to a fair trial. Evidence of prejudice is evaluated under the traditional constitutional harmless error inquiry established in *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). *Sherman*, 305 Kan. at 109. As our Supreme Court has clarified:

> "In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.'" 305 Kan. at 109 (quoting *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 [2011]).

At the outset, Meira candidly concedes that he did not object to any of the State's questions during voir dire that, on appeal, he now claims violated his right to fair trial. Still, Kansas law permits a defendant to raise the issue of prosecutorial error in this context for the first time on appeal. See *State v. King*, 288 Kan. 333, Syl. ¶ 8, 204 P.3d 585 (2009).

7

In his brief, Miera sets out numerous questions asked by the prosecutor during voir dire. Seven of these questions Miera highlighted in bold type. Miera then claims error:

"The State asked case-specific questions, including one[s] that were actually statements—at least five times the State's 'questions' started with 'does everyone understand that . . . .' These 'questions' went beyond asking the potential jurors to commit to certain positions—which is problematic enough—but actually told them what they needed to 'understand.' These comments constitute error."

We will review those seven questions—which include the five "does everyone understand" questions—for error.

Miera complains that at the outset of the voir dire the prosecutor, in the context of advising the jury panel about the type of case to be tried, informed the jury that the "State believes that you will hear evidence that this defendant put his penis in the victim's mouth." A review of the prosecutor's full comments made in conjunction with this statement shows that error did not occur. The prosecutor advised the jury that the charging document alleged that Miera had committed aggravated criminal sodomy and then gave the specific date and address. The prosecutor inquired if everyone understood the charge and then, in one sentence, advised the jury of the State's anticipated evidence to prove that charge. The prosecutor then related the names of several witnesses who would appear at trial to inquire if any juror panelist knew them. Several panelists recognized individuals who were to appear as witnesses.

We find no error in the prosecutor's brief reference to the type of criminal case to be tried and its anticipated evidence in the case. Given the subject matter, child sexual abuse cases have the potential to upset, anger, or arouse sympathy among prospective jurors. The prosecutor was permitted to briefly inform the prospective jurors of the nature of the charge—without argument—that the State was alleging constituted aggravated criminal sodomy. In this way, the State appropriately sought to eliminate possible bias,

8

prejudice, or partiality. See *State v. Reyna*, 290 Kan. 666, 686, 234 P.3d 761 (2010), *overruled on other grounds by State v. Dunn*, 304 Kan. 773, 375 P.3d 332 (2016).

Next, Miera complains of the question: "Does anyone in this room have a problem if a four-year-old victim does not testify? If all of the evidence came back and you believed that the defendant was guilty but the victim did not testify, is there anyone here [who] could not convict the defendant?" Miera argues that this question was impermissible because it referenced whether a lack of evidence would affect a prospective juror's verdict.

The question inquiring whether a prospective juror would have "a problem" if a four-year-old victim did not testify is ambiguous. Was the "problem" that a juror could infer the victim was so traumatized by the incident that she could not testify? Or was the "problem" that a juror could infer that the reason the victim would not testify is because the sexual assault did not occur? This vague question, standing alone, was simply inept because it was susceptible of different meanings.

Miera states a valid concern, however, with the follow-up question because it dealt with how a prospective juror should evaluate evidence or the lack of evidence in arriving at a guilty verdict. Although not exactly on point, in *State v. Hayes*, 258 Kan. 629, 908 P.2d 597 (1995), our Supreme Court found no error due to the district court restricting inquiry during voir dire into the specific opinions of prospective jurors regarding guilt or innocence. In particular, the Supreme Court was concerned that such questions "may be perceived by the juror as 'tending to exact a pledge' from the juror. [Citation omitted.]" 258 Kan. at 635. We are persuaded that the prosecutor's question relating to the effect of the alleged child victim not testifying upon a juror's determination that the defendant was otherwise guilty was error because it had the potential to interfere with the jury's deliberative process.

9

Was this error prejudicial? We are convinced beyond a reasonable doubt that the error did not affect the outcome of the trial in light of the entire record. See *Sherman*, 305 Kan. at 109. Unlike the vast majority of child abuse cases, this case is unique because there was an adult eyewitness to the aggravated criminal sodomy. The jury's view of the credibility of Hand and Miera given their contradictory testimony was determinative of the verdict. Either Miera committed a sexual assault or he innocently had his penis exposed in close proximity to A.H. when his shorts were suddenly pulled down. In either instance, whether A.H., a toddler, could comprehend, recall, recount, and competently testify to such an experience was never an issue raised or argued to the jury by the State or defense.

We next consider the State's voir dire questions that similarly began with the phrase, "Does everyone understand . . . ." Frist, Meira complains of these questions: "Does everyone here understand that in a child sexual assault case there could be delayed disclosure or no disclosure at all? Does everyone understand that? Juror number 11, do you understand that in a child sex case a child may not tell anyone?"

Preliminarily, we observe that voir dire questions about evidence prefaced with the phrase, "Does everyone understand . . . ." risk being erroneous because it presents the prosecutor as an unsworn witness and/or authority with regard to the particular evidence to be presented at trial. See *State v. Simmons*, 292 Kan. 406, 414, 254 P.3d 94 (2011) (Prosecutor erred in voir dire by implying that he was an authority regarding Stockholm Syndrome.).

Still, assuming error, we proceed directly to the prejudice prong because it is apparent that the knowledge or understanding conveyed by the three questions was irrelevant to any issue or evidence in this case. Meira does not favor us with any reference in the record where evidence was produced or any argument was presented that dealt with whether A.H. disclosed the incident, delayed disclosing it, or any incriminating

10

or exculpatory inference attributable to such disclosure or lack of disclosure. Our independent review of the record reveals no evidence about whether A.H. disclosed the incident. Assuming the jury credited the prosecutor's statement of understanding, this knowledge was irrelevant to any issue or evidence in this case and could not have affected the verdict. We find no prejudice.

Next, Meira claims error in these questions: "And does everyone understand that most of the time crimes like these occur in private? No witnesses? And sometimes there's not even physical evidence?" Once again, as the question is framed, the prosecutor erred by suggesting that she had expertise in sexual assault cases and her understanding of the evidence or lack of evidence typically presented in those cases.

Once again, however, we can discern no prejudice. Whether typical sexual assault crimes occur in private without witnesses is irrelevant to the facts of this case. Here, Meira's defense was that at the time of the crime, the back room was somewhat visible to the recreational room wherein there were other individuals in the vicinity. In Meira's view, given the "public" nature of the basement recreational room and back room, it was improbable that Meira would commit a sexual assault at that time and place. In Meira's defense, there was no reason for the crime to occur at this time and place because other individuals in the basement—like Hand—could interrupt and discover the crime. In this way, the prosecutor's framing of the question, conveying that "most of the time crimes like these occur in private? No witnesses," if credited by the jurors, supported Miera's theory of defense and undercut the State's theory of prosecution. Quite simply, there is no showing of prejudice.

Finally, in addition to the prosecutor's comment that "sometimes there's not even physical evidence," Miera also complains of the prosecutor's statement during questioning, "Does everyone understand that there doesn't need to be any video, any DNA, any fingerprint evidence to find a defendant guilty?" As mentioned earlier, these

11

kinds of questions risk error because they suggest the prosecutor is an authority on what evidence is or is not necessary to convict a defendant of a particular crime. See *Simmons*, 292 Kan. at 414. Moreover, these questions may result in interfering with the jury's deliberative process. See *Hayes*, 258 Kan. at 635.

In the case on appeal, although physical evidence was obtained from the next-day sexual assault examination of A.H., no incriminating evidence was found. As detailed in the factual and procedural background section, Latessa, a sexual assault nurse, testified that her clinical examination of A.H. was normal with no indication of whether there had been sexual activity between A.H. and another person. Latessa explained:

> "Most of our exams are normal, 90 to 95 percent of our exams are normal exams, so it didn't surprise me that her exam was normal. It doesn't definitively say one way or the other whether or not the assault happened, it just means I didn't see any injury at the time of my exam."

Based on her experience with oral sex cases, Latessa testified that there would "[m]ost likely not" be evidence of an injury.

In assessing error, it is apparent that the prosecutor's statement in voir dire, "And sometimes there's not even physical evidence" was later shown to be true by Latessa's expert testimony. Our review of the record shows that not only did Meira not contest this voir dire question, he did not contest her expert testimony at trial. Under these circumstances, even assuming error, there was no prejudice.

Similarly, in addition to this statement, a related comment was made by the prosecutor about DNA testing not being required to prove a defendant guilty. The prevalence of neatly packaged investigations and trials on television may lead some potential jurors to expect DNA evidence or slam-dunk testimony during trial. See *Com. v.*

12

*Gray*, 465 Mass. 330, 338-39, 990 N.E.2d 528 (2013) (discussing the so-called "'CSI effect'" and holding that trial court did not abuse its discretion by asking whether lack of scientific evidence would prevent potential jurors from fairly evaluating evidence at trial).

As detailed earlier, Brink, a forensic scientist with the Kansas Bureau of Investigation, tested a pair of underpants and oral swabs taken from A.H.'s mouth to determine the presence of seminal fluid or blood. Upon examination, no such evidence was found. On direct examination, the prosecutor questioned Brink about the absence of any forensic evidence or DNA in the evidence collected:

"Q. And do you always expect to find DNA in a case alleging oral sex?
"A. No.
"Q. OK, and can you tell us some of the reasons why you would not find it?
"A. It's possible that no ejaculation occurred in the case, so we wouldn't find any seminal fluid because there was no ejaculation. It could be that there is a low sperm count in the ejaculate so we wouldn't be able to find sperm to then take on for DNA testing. There is also the possibility of the activities post assault of the victim, and then the time that they report to the hospital to get the sexual assault kit collected, it could be that a significant amount of time has passed so the chances of finding any blood, seminal fluid, amylase is just less likely because of the time that has passed."

In a brief cross-examination, Meira's attorney highlighted one other possible reason why there was no forensic evidence, including DNA, found in the case:

"Q. You've testified to many things that would not cause any of your tests to be positive. Is that correct?
"A. Yes, I have.
"Q. One that you seem to—nobody asked about and I'm going to ask you now. Is it a possibility that no crime occurred?
"A. Yes, That is also a possibility.

13

"Q. If no crime occurred, your reports would be negative, as they are in this case?

"A. Yes, they would be."

Assuming error in the prosecutor's posing of the question about DNA testing not being required to prove a defendant guilty of oral sodomy, expert testimony at trial explained how the absence of such forensic evidence did not necessarily mean that the crime of oral sodomy did not occur. Moreover, defense counsel promptly and effectively also made the obvious point that the absence of forensic evidence in this case was also consistent with Miera not having committed the crime charged. Given Brink's expert testimony and questioning by the prosecutor and defense counsel, we are convinced that no prejudice occurred during voir dire, and Meira was not deprived of his constitutional right to a fair trial.

In summary, upon our review of all the challenged voir dire questions, we are convinced that, taken singularly or cumulatively, there was no prejudice to Miera's constitutional right to a fair trial. We have arrived at this conclusion by employing the traditional constitutional harmless error inquiry set forth in *Chapman*, 386 U.S. 18, and *Sherman*, 305 Kan. at 109.

JURY INSTRUCTION REGARDING ELEMENTS OF AGGRAVATED CRIMINAL SODOMY

For his second issue, Meira contends the district court's instruction listing the elements of the offense of aggravated criminal sodomy "relieved the State of its burden to prove all of the elements of the charged offense beyond a reasonable doubt, specifically Mr. Meira's age and that he acted 'intentionally.'" The State counters that the elements instruction was legally appropriate.

After the close of evidence, the district court and counsel discussed the court's proposed jury instructions. Upon the district court's inquiry, Meira's counsel advised that

14

he had no objection to any of the proposed instructions, including Instruction No. 5 listing the elements of the offense. On appeal, Meira acknowledges this failure to object. As given to the jury, Instruction No. 5 provided:

"The defendant is charged with aggravated criminal sodomy. The defendant pleads not guilty.

"To establish this charge, each of the following claims must be proved:

"1. The defendant engaged in sodomy with A.H.

"2. At the time of the act, A.H. was less than 14 years old. The State need not prove the defendant knew the child's age.

"3. The defendant acted intentionally.

"4. The defendant was 18 or more years old at the time the sodomy occurred.

"5. The act occurred on or about the 1st[t] day of March, 2016, in Wyandotte County, Kansas.

"'Sodomy' means oral contact of the male genitalia.

"'Aggravated criminal sodomy' means sodomy with a child who is less than 14 years old."

Our standards of review provide:

"When analyzing jury instruction issues, an appellate court follows a three-step process by: (1) Determining whether the appellate court can or should review the issue, *i.e.*, whether there is a lack of appellate jurisdiction or a failure to preserve the issue for appeal; (2) considering the merits to determine whether error occurred below; and (3) assessing whether the error requires reversal. *State v. Pfannenstiel*, 302 Kan. 747, 752, 357 P.3d 877 (2015). Whether a party has preserved a jury instruction issue affects the reversibility inquiry at the third step. 302 Kan. at 752; see also K.S.A. 2015 Supp. 22-3414(3) ('No party may assign as error the giving or failure to give an instruction . . . unless the party objects thereto before the jury retires to consider its verdict . . . unless the instruction or the failure to give an instruction is clearly erroneous.')" *State v. Louis*, 305 Kan. 453, 457, 384 P.3d 1 (2016).

Because Miera did not object at trial to the instruction, our court must determine if Instruction No. 5 was clearly erroneous. In evaluating whether an instruction rises to the level of clear error, the issue of "[r]eversibility is subject to unlimited review and is based on the entire record. It is the defendant's burden to establish clear error under K.S.A. 22-3414(3). [Citation omitted.]" *State v. Betancourt*, 299 Kan. 131, 135, 322 P.3d 353 (2014). The clear error determination must review the impact of the erroneous instruction in light of the entire record including the other instructions, counsel's arguments, and whether the evidence is overwhelming. *In re Care & Treatment of Thomas*, 301 Kan. 841, 849, 348 P.3d 576 (2015). To establish clear error, "'the defendant must firmly convince the appellate court that the giving of the instruction would have made a difference in the verdict.' [Citation omitted.]" *State v. Cooper*, 303 Kan. 764, 771, 366 P.3d 232 (2016).

Miera presents a two-part argument. First, he asserts Instruction No. 5 was structural error because "[i]n this case the district court did not omit an element of a charged crime, but rather allowed the jury to find Mr. Miera guilty without the State proving every element of the charged offense beyond a reasonable doubt. This, Mr. Miera submits is structural error." More specifically, Miera alleges that the "purposeful inclusion of a definition of 'aggravated criminal sodomy' is structural error." In essence, Miera claims that the inclusion of the definition of aggravated criminal sodomy resulted in the jury ignoring two of the five elements or claims that the district court instructed must be proven by the State—Miera's age and that he committed the act intentionally. Miera characterizes this as a "conditional directed verdict."

Alternatively, Miera argues that if our court does not embrace his structural error theory, then he still prevails because had the "jury been properly instructed, there is a very real possibility that [it] would not have found the evidence sufficient that Mr. Miera acted intentionally."

16

We find no merit to either of Miera's theories of instructional error.

First, the plain language of Instruction No. 5 directed the jury that in order to find Miera guilty, five separate and enumerated claims "must be proved" by the State. Those claims included Miera's age and that he intended to commit the criminal act. The inclusion of the statutory definition of aggravated criminal sodomy at the end of the instruction was not listed as part of the five claims and was surplusage.

Second, with regard to proof of intent, the district court also provided the jury with Instruction No. 6 which stated: "The State must prove that the defendant committed the crime of aggravated criminal sodomy intentionally. A defendant acts intentionally when it is the defendant's desire or conscious objective to do the act complained about by the State." Read together, Instruction Nos. 5 and 6 clearly required the jury to consider the third enumerated claim in Instruction No. 5 related to proof of Miera's intent.

Third, contrary to Miera's argument, there is no question that the jury was properly instructed that each of the five elements or claims (including Miera's age and intent) must be proved beyond a reasonable doubt. That was the specific admonition stated in Instruction No. 9:

> "The State has the burden to prove the defendant is guilty. The defendant is not required to prove he is not guilty. You must presume that he is not guilt unless you are convinced from the evidence that he is guilty.
> "The test you must use in determining whether the defendant is guilty or not guilty is this: *If you have a reasonable doubt as to the truth of any of the claims required to be proved by the State*, you must find the defendant not guilty. *If you have no reasonable doubt as to the truth of each of the claims required to be proved by the State*, you should find the defendant guilty." (Emphasis added.)

17

Fourth, the jury was appropriately informed at the beginning of the instructions that "it is your duty to consider and follow *all* of the instructions." (Emphasis added.) Meira's laser-like focus on a one sentence definition of aggravated criminal sodomy impermissibly discounts the several specific instructions, read together, which clearly directed the jury to consider the five elements or claims using a reasonable doubt standard. As our Supreme Court has stated, to consider a portion of an instruction without regard to the other instructions "would invite dissection of instructions to find portions that, when read in isolation, misstate the law. We credit juries with an ability to understand words in context." *State v. Sisson*, 302 Kan. 123, 132, 351 P.3d 1235 (2015).

Finally, Instruction No. 5 closely follows PIK Crim. 4th 55.060, which identifies the specific and separate claims that must be proven to find a defendant guilty of aggravated criminal sodomy. Our Supreme Court "strongly recommend[s] the use of PIK instructions, which knowledgeable committees develop to bring accuracy, clarity, and uniformity to [jury] instructions." *State v. Barber*, 302 Kan. 367, 377-78, 353 P.3d 1108 (2015). Even the district court's unnecessary addition of the definition of aggravated criminal sodomy at the end of Instruction No. 5 was consonant with the definition of the crime found in PIK Crim. 4th 55.020(f).

In summary, appellate courts consider "'jury instructions as a whole, without focusing on any single instruction, in order to determine whether they properly and fairly state the applicable law or whether it is reasonable to conclude that they could have mislead the jury.'" *State v. Butler*, 307 Kan. 831, 843, 416 P.3d 116 (2018). Upon our review of Instruction No. 5 in context with Instruction Nos. 6 and 9 and the prefatory remarks to all the jury instructions, we are convinced the district court did not commit instructional error.

Miera contends there was insufficient evidence for a jury to find that he acted intentionally beyond a reasonable doubt. "'When the sufficiency of evidence is challenged in a criminal case, this court reviews the evidence in a light most favorable to the State to determine whether a rational fact-finder could have found the defendant guilty beyond a reasonable doubt.' [Citation omitted.]" *State v. Rosa*, 304 Kan. 429, 432-33, 371 P.3d 915 (2016). "'In making a sufficiency determination, the appellate court does not reweigh evidence, resolve evidentiary conflicts, or make determinations regarding witness credibility. [Citations omitted.]'" *State v. Dunn*, 304 Kan. 773, 822, 375 P.3d 332 (2016). It is only in rare cases where the testimony is so incredible that no reasonable fact-finder could find guilt beyond a reasonable doubt that a guilty verdict will be reversed. *State v. Matlock*, 233 Kan. 1, 5-6, 660 P.2d 945 (1983).

Miera argues that even if the jury believed Hand, there was no evidence about "how A.H. came to have her mouth on Mr. Miera's soft penis while Mr. Miera was slumped on the bed in a room with no door in a house full of people."

We have considered the totality of the trial evidence and, in a light most favorable to the State, Hand's eyewitness testimony established that Miera was on his bed, slouched against the wall, with his penis in A.H.'s mouth. At the time, Miera's shorts were pulled down to mid-thigh. After noticing Hand, Miera covered his face and exclaimed, "[O]h shit. [Expletive]."

Viewing the evidence in a light most favorable to the State, we are convinced that a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. See *Dunn*, 304 Kan. at 432-33.

## CUMULATIVE ERROR

Miera argues that if any single error was harmless, the cumulative impact of multiple errors deprived him of a fair trial. Our standard of review in this regard is whether the totality of the circumstances establish that the defendant was substantially prejudiced by cumulative errors and was denied a fair trial. In assessing the cumulative effect of errors during the trial, the appellate court examines the errors in the context of the entire record, considering how the trial judge dealt with the errors as they arose; the nature and number of errors and their interrelationship, if any; and the overall strength of the evidence. *State v. Holt*, 300 Kan. 985, 1007, 336 P.3d 312 (2014).

We have previously addressed the errors which occurred during voir dire and found that taken individually and collectively they were not prejudicial to Meira's constitutional right to a fair trial. We have found no other errors. Considering the record as a whole, the nature and number of voir dire errors, and the overall strength of the State's case based on eyewitness testimony, we reaffirm our prior finding that Meira has not been prejudiced.

Affirmed.