NOT DESIGNATED FOR PUBLICATION

No. 126,794

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

CATHERINE SHORT,
*Appellant*,

v.

MICHAEL B. ROBERTSON, M.D.,
*Appellee*.

MEMORANDUM OPINION

Appeal from Johnson District Court; JAMES F. VANO, judge. Oral argument held July 25, 2025. Opinion filed December 5, 2025. Affirmed.

*James M. Crabtree*, of Crabtree Law Office, of Overland Park, for appellant.

*Mark A. Lynch* and *Brenna M. Lynch*, of Simpson Logback Lynch Norris, P.A., of Overland Park, for appellee.

Before COBLE, P.J., ISHERWOOD and HURST, JJ.

PER CURIAM: Catherine Short claimed medical negligence by Michael B. Robertson, M.D., and now appeals a Johnson County jury's verdict in favor of Dr. Robertson, alleging trial errors undermined her ability to obtain a fair trial. Short contends that the district court's decision to conduct a "town hall" type of jury selection impaired her ability to fashion an impartial jury panel. Short also contends that the district court's failure to sustain her objection to Dr. Robertson's comments during closing argument improperly influenced the jury to adopt Dr. Robertson's theory of the case. After thorough review of the parties' arguments, we affirm the jury's verdict.

1

FACTUAL AND PROCEDURAL BACKGROUND

After a biopsy revealed cancer in her right breast, Short scheduled a lumpectomy surgery to remove the affected tissue. The medical staff conducting the biopsy placed a beacon marker clip designed to provide ultrasound guidance to the area that needed to be excised.

On the date of the surgery, Dr. Robertson worked as the radiologist who performed a wire localization procedure before the surgery. The procedure placed a special wire designed to guide the surgeon to the affected tissue, called a "Kopans wire." Dr. Robertson used ultrasound imaging but was unable to visualize the marker clip clearly. Dr. Robertson claimed he could see the mass of cancerous tissue on the ultrasound and therefore did not need to find the clip. He did not choose to identify the clip with another form of imaging.

The guide wire was either misplaced or became displaced before the surgery, resulting in the removal of healthy tissue rather than the diseased tissue. The surgical team took a "specimen radiograph" of the tip of the wire placed in the first surgery. A radiograph is "a picture produced on a sensitive surface by a form of radiation other than visible light," such as an X-ray. Merriam-Webster Online Dictionary.

Short required a second surgery, resulting in substantial deformity of her right breast and considerable pain. She also required plastic surgery to manage the deformity and reduce pain. The second surgery was preceded by a new wire localization procedure performed by a different radiologist. This radiologist confirmed the wire placement through mammogram imaging. The surgical team took another specimen radiograph of the placement of the wire.

Short filed suit against Olathe Medical Center and Dr. Robertson, alleging negligence in the first wire localization procedure. The district court dismissed Olathe Medical Center from the case. The case against Dr. Robertson was tried to a jury over five days in June 2023. Ultimately, the jury returned a verdict in favor of Dr. Robertson.

Short appeals the judgment for Dr. Robertson. Additional facts are discussed below as pertinent to the issues raised on appeal.

ANALYSIS

*The District Court Did Not Abuse Its Discretion When Conducting Jury Selection*

Short first contends that the district court abused its discretion in conducting jury selection, or voir dire. The district court allowed counsel to ask open-ended questions of the jurors simultaneously in an open format—which Short dubs a town hall style format—rather than following the traditional procedures for jury selection.

*Jury Selection*

At the final pretrial conference just before trial, the district court noted that Short's counsel disagreed with the jury selection procedure proposed by the court. Though the record does not disclose the precise timing of the notice, the district court apparently notified the parties of its intent to hold a town hall style jury selection at some point before the pretrial conference. Both parties orally objected to the proposed procedure, for different reasons, during the pretrial conference.

The district court explained that it wanted to conduct jury selection with open-ended questioning by the attorneys because it provided greater depth of responses from the prospective jurors. The court believed this type of responses would aid the court in determining a juror's objectivity more than affirmative or negative replies to leading

3

questions from the attorneys. The court also believed that permitting the attorneys to ask questions of potential jurors collectively rather than serially would save time by avoiding repetitious questioning. While the court stated it planned to limit questioning to two hours, it also expressed an openness to extend the time for questioning if counsel requested it.

On the first day of trial, jury selection began with the court questioning the potential jurors about their compliance with the statutory juror qualifications. The court then asked some preliminary, non-case-specific questions to establish the jurors' basic abilities to serve and then turned questioning over to the attorneys. Both parties' attorneys introduced themselves and their staff, asking a few preliminary questions of the potential jurors.

Dr. Robertson's attorney then provided the jury with a summary of the case and opened the substantive inquiry. During the questioning, Short's attorney interjected some follow-up questions about some of the jurors' responses. Each attorney had an opportunity to open a line of questioning, and opposing counsel was permitted to follow up on any line of questioning raised.

During questioning after the morning break, Short's counsel moved to strike one juror because of a stated bias and complained that defense counsel rehabilitated the juror in opposition to Kansas Supreme Court precedent. Without addressing the potential bias, the district court chastised the parties for failing to ask open-ended questions. Nevertheless, the court expressed concern over that juror's responses to questions about scheduling conflicts and excused the juror.

Short's counsel then switched the questioning to issues the jurors may have with medical malpractice cases. In that questioning, Juror J.H. expressed hesitancy about finding medical malpractice unless there was clear evidence of neglect or abuse. The

4

juror expressed her hesitancy in finding malpractice as a 7 or 8 out of 10. But, instead of asking the court to strike Juror J.H. for cause, Short's counsel asked the jury panel generally whether anyone else felt similarly.

Another prospective juror expressed a bias against medical malpractice suits as a first responder. She indicated a bias of at least 5 out of 10. Short's counsel moved to strike the juror for cause. Despite Dr. Robertson's attempts to demonstrate the juror's ability to remain objective, the district court dismissed the juror for cause.

While the next potential juror was being called, the court discussed the applicable burden of proof with the jurors. The court explained that the case would not even proceed to trial if the malpractice was evident to a layperson. The case required competing experts. In discussing the burden of proof the plaintiff had to carry, the judge stated:

> "I've heard the word clearly used, and there is a standard in law for clear and convincing evidence. That's not the standard in a medical malpractice case. If you're going to apply that standard, I need to know that, because that's going to tell me you're a juror that's not going to follow the law. I'm going to give you those instructions as to what the law is. And by expressing your opinions at a point when you haven't been given the law, you may have that misconception. I need to know if you are going to be able to follow the law. If your bias is so strong that you won't follow the instructions. Because at this point it looks like there is, at least for the plaintiff, a burden of proof to prove by a preponderance of the evidence that her claims are more likely true than not true.
>
> "And none of this has anything to do with calling anybody a bad person. This is about a medical negligence case, which we call malpractice. And you get to decide the weight to give to the testimony of each witness, including experts. And you get to decide the credibility of the proof, the facts upon which an expert gives an opinion. You get to decide on those facts whether it's true or not true. That's the job of the jury.
>
> "So let's make sure we have our terms defined before you answer the ultimate question, which ultimately I have to answer. Can you fairly—are you a person who probably can hear the evidence fairly and impartially? So if you have any question about

5

the terms being used, you can ask them questions and I'll jump in and answer as to what the law is if I need to."

The court then went to a lunch break. After the break, Short's counsel resumed questioning the prospective jurors' attitudes towards medical malpractice. Another juror, a nurse, indicated that her bias against a medical malpractice suit was also a 5 out of 10. She was not struck for cause because she indicated an ability to find for the plaintiff if the evidence supported it. Short's counsel then returned to Juror J.H.'s bias against medical malpractice. This time, the juror clarified that she believed she could apply a preponderance-of-the-evidence standard in the case. After that answer, the plaintiff did not immediately seek to strike the juror for cause.

Shortly thereafter, Dr. Robertson's counsel questioned the potential jurors about their attitudes towards and experiences with healthcare professionals. Short's counsel followed up on the same line of questioning. When a juror indicated that she would not want to hold a doctor accountable for his or her actions, the plaintiff moved to strike for cause, and the district court granted the motion. Counsel took turns questioning the prospective jurors on issues important to their clients and had opportunities to follow up after opposing counsel's questions.

After discussing the potential jurors' views on a wide range of topics, Short's counsel again returned to Juror J.H. The juror indicated that her bias against medical malpractice actions was subjective based on her professional experience. Short requested to remove the juror for cause, which the judge denied, stating, "I don't think I've heard enough evidence to find probability that she's incapable of fairly hearing the evidence of your side of the case." Instead of following up with Juror J.H.'s bias against medical malpractice suits, Short's counsel then asked the juror whether, if she were in the plaintiff's position, she would want someone like herself to sit on the jury. Juror J.H. replied that she would. Short's counsel neither renewed the request to strike Juror J.H. for

6

cause nor continued to question the juror. After a few more questions by both sides, the parties' attorneys passed the jury panel for cause. Short's attorneys exercised one of their peremptory challenges to remove Juror J.H. from the jury. At the conclusion of the peremptory challenges, the jury was sworn and the case proceeded to trial.

*Standard of Review*

The purpose of the jury selection process is to select competent jurors who may consider the case without bias, prejudice, or partiality. A district court has broad discretion in conducting jury selection, so appellate review of a district court's control of jury selection is limited to determining whether the court abused its discretion. *State v. Hayes*, 258 Kan. 629, 631, 908 P.2d 597 (1995); *Atwell v. Imseis*, 37 Kan. App. 2d 435, 436, 154 P.3d 511 (2007).

Judicial discretion is abused when the court's decision violates the applicable law, fails to find factual support within the record, or otherwise constitutes arbitrary, capricious, or unreasonable conduct, meaning that no reasonable person in the position of the district court would have made the same decision. *League of Women Voters of Kansas v. Schwab*, 318 Kan. 777, 788, 549 P.3d 363 (2024).

*Application of Legal Standards*

The legal framework for jury selection is governed by K.S.A. 2024 Supp. 60-247(b), which requires only the examination of jurors under oath regarding their qualifications to serve as jurors and the opportunity for the parties or their attorneys to examine prospective jurors. The statute does not prescribe a particular method or order of examination. Short does not contend that either of these requirements were violated through the method of jury selection the district court conducted in this case. She asserts, without authority, that K.S.A. 60-247 assumes that each party will conduct voir dire

separately from one another. To the contrary, the applicable statutory language only requires that each party have an adequate opportunity to examine the potential jurors—"The court must permit the parties or their attorneys to conduct an examination of prospective jurors." K.S.A. 2024 Supp. 60-247(b). Nothing within that language directs the method of jury selection; it only requires that the court permit each party an adequate opportunity to explore the potential biases and prejudices of the prospective jurors.

Notably, Short cites no authority, in Kansas or another jurisdiction, directing or suggesting that simultaneous questioning of potential jurors impairs a party's ability to discern potential prejudices. Short cites *State v. Jackson*, 234 Kan. 84, 670 P.2d 1327 (1983), which implicitly approves of simultaneous questioning during jury selection. In *Jackson*, a criminal defendant was representing himself at trial. The district court required Jackson to conduct voir dire along with the prosecution, permitting individualized follow-up questions of specific potential jurors as needed. In rejecting Jackson's argument that the limitations on jury selection imposed by the court prejudiced his ability to obtain a fair trial, the Kansas Supreme Court stated:

> "A trial court has a broad discretion in controlling the voir dire examination in criminal cases. In the absence of a showing of an abuse of discretion and prejudice, the rulings of a trial court limiting a defendant's voir dire examination of jurors will not be made the basis for a reversal of a case. *State v. Lytle*, 177 Kan. 408, 280 P.2d 924 (1955). The record discloses that the trial court never limited the scope of the voir dire examination by the defendant except by requiring both counsel to ask questions of the jury collectively and then to follow up with specific questions to individual jurors where applicable. . . . The defendant then passed the jury for cause." *Jackson*, 234 Kan. at 86.

Short contends that *Jackson* should not be read as an endorsement of this type of jury selection method, but that argument misses the point. The relevant inquiry is not which method of jury selection the Kansas Supreme Court *endorses* but whether the method selected by the district court constitutes an abuse of judicial discretion as

8

improper. *Jackson* suggests that the method of jury selection endorsed by the district court in this case is not automatically legal error as an abuse of judicial discretion.

Likewise, Short does not articulate what facts the district court ignored in reaching its decision regarding the method of jury selection. Accordingly, appellate review of the district court's decision is guided by general rules of judicial discretion and fairness. *Atwell*, 37 Kan. App. 2d at 436-37.

On appeal, Short points to no caselaw directing that questioning by both attorneys collectively rather than serially undermines the court's ability to empanel a fair and qualified jury. Rather, existing caselaw regarding the method of jury selection focuses on whether each party has had a full opportunity to explore potential jurors' biases or prejudices. See *State v. Aikins*, 261 Kan. 346, 367-68, 932 P.2d 408 (1997) (whether defendant's counsel had adequate opportunity to question jurors about pretrial publicity and whether the publicity prejudiced the jurors); *State v. Shannon*, 258 Kan. 425, 432-34, 905 P.2d 649 (1995) (ability to question jurors individually about prejudice related to abortion clinic providers). In both *Aikins* and *Shannon*, the cases involved criminal defendants and the prejudices at issue involved race and abortion rather than prejudices related to medical malpractice. Still, the Kansas Supreme Court found no abuse of discretion in the district court's refusal to deny the request for individual questioning of jurors outside the hearing of the rest of the panel.

In this case, Short has not demonstrated that the district court's method of jury selection deprived her of the ability to question jurors fully about deep-seated prejudices. See *State v. Robinson*, 303 Kan. 11, 135-36, 363 P.3d 875 (2015) (district court may violate constitutional rights by unduly restricting questioning of potential jurors); *State v. Reyna*, 290 Kan. 666, 688, 234 P.3d 763 (2010). A review of the transcript reveals that the district court did not limit the content of the attorneys' questions, and, despite a stated intent to limit the duration of jury selection, the district court permitted the parties'

attorneys to exhaust their questions of the jury panel. Short has not asserted that a prejudice against or in favor of the medical establishment was so embarrassing that the district court should have permitted more discrete questioning. The argument merely involves the order in which the attorneys questioned the jurors. While Short levels conclusory accusations of prejudice against the district court, her argument fails to articulate how this method prevented her from conducting a full examination of the potential jurors to root out bias or lack of qualifications or otherwise resulted in specific prejudice to her case.

Short's appellate brief contains multiple appeals to the preservation of the traditional method of conducting jury selection and the attendant benefits of that traditional method. But these arguments are policy arguments better presented to a legislative body. See *In re I.A.*, 313 Kan. 803, 814, 491 P.3d 1241 (2021) (argument regarding disparity in notification requirements between criminal procedural statutes and juvenile procedural statutes is a policy argument properly left to the Legislature). None of the arguments demonstrate that the district court's chosen method of jury selection in this instance was inherently prejudicial to either party.

Attempting to demonstrate prejudice, Short points to two circumstances that she attributes to confusion created by the unorthodox jury selection method: the district court's refusal to remove Juror J.H. for cause and the removal of two other jurors on the fourth day of trial.

*Refusal to Remove J.H. for Cause*

Short's argument related to her inability to remove Juror J.H. for cause fails to explain how the procedure of jury selection used by the district court prevented her from challenging the juror for cause, which she attempted, or how a traditional method of jury

10

selection would have resulted in Juror J.H. being removed for cause when the juror was not removed under this process.

The remedy for allegations of juror partiality is a hearing at which the party alleging the partiality must prove actual bias. *Smith v. Phillips*, 455 U.S. 209, 215, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982). A party may request such a hearing at any time, including after the trial. 455 U.S. at 217-18. Because Short exercised a peremptory challenge to remove Juror J.H., a hearing on the juror's partiality was immaterial. Instead, she raises vague claims about potential bias and prejudice in the form of her having to use her peremptory challenges to remove other potentially biased jurors, specifically Juror B.L., who eventually became the foreperson of the jury.

None of her arguments bear a logical connection to the method of jury selection used by the district court in this case. She suggests that, had she been able to conduct all her questioning first, she could have moved to strike Juror J.H. for cause and would not have had to use a peremptory strike to remove her. But the argument does not follow and is based entirely on speculation. See *State v. Swarthout*, No. 101,255, 2009 WL 4639575, at *3 (Kan. App. 2009) (unpublished opinion) (speculation insufficient to sustain claim of prejudice in jury selection). If the court had conducted a traditional method of jury selection and Short had moved to strike Juror J.H., Dr. Robertson's attorney would have had an opportunity to inquire about the juror's ability to judge the case impartially. Presumably, the juror would have provided the same responses she provided under this town hall method of questioning. It is pure speculation to conclude that the responses from any prospective juror would have been different under a different method of questioning.

A district court does not abuse its discretion in failing to remove a juror for cause, even when a juror makes some concerning comments, if the district court is satisfied that juror can make a fair and impartial decision based on the law provided by the court and

11

the evidence presented at trial. See *State v. Thurber*, 308 Kan. 140, 182-83, 420 P.3d 389 (2018); *State v. Cheever*, 306 Kan. 760, 787, 402 P.3d 1126 (2017).

But, even if we assume that a more traditional method of jury selection would have resulted in the district court's removal of Juror J.H. for cause, Short fails to establish the requisite prejudice necessary to demand reversal of the verdict and remand for a new trial. See *State v. Doyle*, 272 Kan. 1157, 1168, 38 P.3d 650 (2002) ("The failure to excuse a juror for cause does not constitute a ground for reversal unless the [party] was prejudiced thereby."); *State v. Pioletti*, 246 Kan. 49, 54, 785 P.2d 963 (1990); *King v. Casey's General Stores, Inc.*, 57 Kan. App. 2d 392, 400, 450 P.3d 834 (2019).

In a civil action, a verdict may be sustained by 10 of the 12 jurors agreeing on a verdict. *Hendrix v. Docusort, Inc.*, 18 Kan. App. 2d 806, Syl. ¶ 1, 860 P.2d 62 (1993). Short did not request polling of the verdict, so there is no record of the voting pattern of the jury. The verdict may have been unanimous by all 12 jurors or may have had one or two dissenting voices. Even if Juror J.H. had been removed for cause, permitting Short's attorney to exercise a remaining peremptory challenge against Juror B.L., there is nothing in this record to suggest that the replacement jurors would have resulted in a better outcome or that the jurors voting in favor of Dr. Robertson would have fallen below 10.

The district court's refusal to strike Juror J.H. is not sufficient evidence of prejudice arising from the method of jury selection to warrant reversing the verdict and remanding for a new trial.

*Dismissal of Jurors N.V. and J.W. During Trial*

On the fourth day of trial, the district court dismissed two jurors, N.V. and J.W., eliminating the potential for alternate jurors. Juror N.V. raised a potential conflict at the end of the third day of trial, and the matter was considered by the court before the trial

commenced the next day. Juror N.V. mentioned a personal relationship with a witness who was present for the localization wire procedure. The court asked Juror N.V. why he said nothing when the witnesses were named during the jury selection process, and Juror N.V. replied that he knew the witness under her maiden name and did not make a connection until evidence was presented at trial. The court then dismissed Juror N.V.

As to the second juror, after the trial began, Juror J.W. contacted the bailiff, expressing concern about her knowledge of the reconstructive surgery involved in the case with its recovery times and pain. Juror J.W. claimed she could be fair but wanted the court to know of her experiences. This juror volunteered that she was asked about lumpectomies and generally about reconstructive surgeries during jury selection but not specifically about the type of reconstructive surgery Short endured. Based on J.W.'s comments, the court excused her from the jury.

Short cites these late dismissals as symptoms of the problematic method of jury selection. But, again, Short's suggestion of causation is entirely speculative. For Juror N.V., the list of witnesses was read to the jury. He simply did not make the connection because he knew the witness by her maiden name. Nothing in Juror N.V.'s comments suggests that the personal connection would have been revealed to the court under a traditional method of jury selection. Under a traditional method, an attorney lists the potential witnesses, just as in the method used in this case.

For Juror J.W., the questioning about potential jurors' experiences with reconstructive surgery simply did not get detailed enough. It was the nature of the specific reconstructive surgery that Short had to endure that created the personal conflict for Juror J.W. Given the nature of these specific personal experiences, there is no rational reason to believe either attorney would have asked more precise questions about reconstructive surgery if the district court had used a more traditional method of jury selection.

13

*Jury Selection Conclusion*

Short argues the experimental voir dire process resulted in unfair prejudice by claiming the process "clearly failed" with the two excused jurors. We have examined those claims and found them unpersuasive, and found the court's refusal to strike Juror J.H. did not provide sufficient evidence of prejudice arising from the method of jury selection. Short also argues it is her "belief" that the verdict did not "command entire confidence" due to the method of jury selection. But suspicion of bias is not enough to overcome the district court's wide discretion.

Although this novel method of jury selection is perhaps better left for academic study rather than experimentation in the courtroom to avoid this sort of claim, on this record, Short has failed to establish that no reasonable person in the position of the district court would have opted to conduct jury selection in this manner or that she was prejudiced by the method the court utilized. As a result, we find no abuse of discretion.

*The Error by the District Court in Overruling Short's Objection to Defense Counsel's Closing Argument as to Exhibit 16 Is Harmless*

Short next challenges statements Dr. Robertson's attorney made during closing arguments. During Dr. Robertson's closing argument, his attorney commented that Exhibit 16—the specimen radiograph taken after the second lumpectomy—showed a "normal" localization wire. Short's counsel objected to this comment, but the district court overruled the objection. Short now contends the district court's ruling amounted to prejudicial error.

*Evidence and Closing*

The parties' positions at trial boiled down to Short arguing that Dr. Robertson placed the wire in the wrong location during the first procedure, while Dr. Robertson's

defense was that the wire was dislodged and moved in the short period of time between his placement of the wire and Short's transfer to surgery, so wire placement in each surgery was a primary topic. After each of Short's lumpectomy surgeries, the surgical team took specimen radiographs, which depicted the placement of each wire used to guide the surgeon to the cancerous tissue. Both specimen radiographs found in Exhibits 13 (first surgery) and 16 (second surgery) were admitted into evidence by stipulation at the beginning of plaintiff's case-in-chief. But Exhibit 16 depicting the wire placed before Short's second surgery was not actually published to the jury until defense counsel's closing argument. None of the medical expert testimony specifically addressed Exhibit 16, although two wire kits were shown to multiple witnesses and conversation about the differences between the first and second wire's appearance permeated the trial.

In closing arguments, Short's counsel discussed that in opening, defense counsel had

"stood up and . . . showed [the jury] one picture of the wire and it's kind of opened up a little bit. And then the first picture of the wire, he didn't show . . . it opening. He sort of told you there were some differences, and there is. It's got a hook in it. Now, I've tried in my mind to figure out at what angle you can turn a hooked wire like that and have it look like an open wire of vice versa, you can turn an open wire that was the second or third picture and have it look like that. And I can't—I can't square it."

At the conclusion of this discussion, Short's counsel invited defense counsel, "So maybe [defense counsel] will show us on his part of the exam how that is possible."

During the defense counsel's closing arguments, one of the theories pursued by Dr. Robertson's counsel was that the first wire placed by Dr. Robertson was somehow dislodged during the brief time between when Dr. Robertson placed the wire and Short's move to surgery. In this discussion, counsel argued that "if traction is placed on the wire, the wire can overbend," and counsel put up photos of hook wires showing "normal" tips

15

and at least one photo depicting an overbent wire. In discussing Exhibit 13—the specimen radiograph taken during the first surgery—defense counsel focused on the abnormal condition of the wire.

> "Now, there are three specimen radiograph pictures here. The testimony has been that all three of them would have been taken during the surgery. The reason they are taken is because the surgeon is looking for the clip. All three of these then are taken because in searching for the clip, orientation of the specimen in its container is changed so that these are taken at a different angle every time. One angle and it's true don't know the order these are taken in, but one angle is this one that we have here. The other two angles show you that this hook is actually opened up. Now, whether you consider that overbent or simply unbent or not, bottom line here is that this is not normal. Folks, that is not normal. Nobody has said that that actually looks like a normal typical wire."

Defense counsel then shifted to a discussion of Exhibit 16 as an example of a specimen radiograph of a "normal" wire.

> "Let's look at what a normal typical wire looks like. There was also a specimen radiograph done that shows this wire on September 15th. . . . You're looking at that right now, folks. Look at what the tip of that wire looks like. It appears completely normal in its orientation. This is how it should look if no traction and overbending were applied to it. Now, to be fair, Dr. Robertson did testify that in order to get the best picture of this, you have to have multiple angles. And unfortunately, we don't have that here. But there is no question that that angle clearly shows the way a Kopans hook should look, thus lending much support to the idea that this one on July the 8th is clearly—"

Short's counsel interposed an objection that the evidence did not support the assertion that Exhibit 16 demonstrated how a "normal" Kopans hook should appear. Dr. Robertson's counsel merely replied that it was closing argument. The court overruled the objection, instructing the jury to decide the case on the evidence received. Dr. Robertson's counsel then continued the discussion of the specimen radiographs.

"Review the picture yourself, folks. You've seen the way a Kopans hook looks. You've seen the way that the end of the hook looks in this case. Nobody has said that the wire looks normal at all. In fact, Dr. Anderson noted that the wire looks unbent. Again, the idea is that the only way that kind of thing can happen is that if traction is applied to the wire, the wire is pulled out of place and it gets overbent in that fashion."

When presenting rebuttal argument, Short's counsel urged the jury to consider what the evidence revealed, not what defense counsel claimed it revealed. But plaintiff's counsel did not specifically address the argument regarding the "normal" appearance of a Kopans wire.

*Applicable Legal Standards*

Challenges to closing arguments do not often arise in civil cases. Nevertheless, the Kansas Supreme Court has held that attorneys are granted wide latitude in making arguments in a civil case, and a court should not impose narrow and unreasonable limitations on those arguments. *Castleberry v. DeBrot*, 308 Kan. 791, 807, 424 P.3d 495 (2018). The content and scope of arguments in a civil case rest largely within the discretion of the district court. *Timsah v. Gen. Motors Corp.*, 225 Kan. 305, 316, 591 P.2d 154 (1979); *Skelly Oil Co. v. Urban Renewal Agency of City of Topeka*, 211 Kan. 804, 807, 508 P.2d 954 (1973).

Still, counsel may not inject error into a trial by exceeding that latitude. *Castleberry*, 308 Kan. at 807. Though this case is civil, Kansas appellate courts have not strictly distinguished between criminal and civil cases in examining the propriety of arguments. *In re Care & Treatment of Ward*, 35 Kan. App. 2d 356, 377, 131 P.3d 540 (2006) ("[T]here exists in Kansas civil and criminal jurisprudence a long history wherein our Supreme Court has admonished trial counsel to argue the evidence and avoid rhetoric designed to inflame the passions and prejudices of the jury, thereby diverting the jury from its duty to fairly and impartially evaluate the evidence."). In *Castleberry*, the court

concluded that comments directing the jury to decide the case on matters outside the law and the evidence exceeded the permissible scope of argument. 308 Kan. at 808. Similarly, arguments not based on the evidence presented at trial or reasonable inferences properly drawn from that evidence would exceed the scope of permissible argument. *State v. Watson*, 313 Kan. 170, 179, 484 P.3d 877 (2021) ("[A] prosecutor errs by arguing a fact or factual inference with no evidentiary foundation.").

Once a court determines that the permissive scope of argument has been exceeded, the court must then determine whether the error requires reversal because the opposing party's right to a fair trial has been violated. The test is whether the error created a reasonable probability of a different outcome in light of the entire record. *Castleberry*, 308 Kan. at 807; *Sledd v. Reed*, 246 Kan. 112, 117-18, 785 P.2d 694 (1990). Our Supreme Court has "made clear the party benefiting from the error has the burden to show harmlessness . . . ." *Castleberry*, 308 Kan. at 809.

*Application of Legal Standards*

Short contends that no expert witness testified about Exhibit 16. Dr. Robertson does not contradict this claim, instead pointing to other testimony in the record in which Dr. Robertson and his defense expert explained the function and appearance of Kopans wires used to mark surgical sites.

Exhibit 16 was admitted into evidence without objection based on the parties' stipulation without foundation from any witness. Dr. Robertson used Exhibit 13, along with demonstrative exhibits, to explain how an intact Kopans wire should appear, the angle of the hookwire's fixed metal bend, and how the wire shown in Exhibit 13 differed from a "normal" wire placement. Dr. Robertson opined that the Kopans wire he placed before the first surgery was somehow displaced before the surgery, given the wire's near 90-degree angle at the tip of the wire, compared to the "10- or 15-degree angle" seen on a

18

normal wire. This testimony was supported by defense expert Dr. Richard Kuckelman, who explained what a "Kopans wire" was and established the proper placement of a Kopans wire with demonstrative exhibits. He explained that the tip of the wire "comes up, does a little tight curl, and comes back down and it forms this acute angle hook on the end of the wire." Kuckelman also opined that, based on the appearance of the wire in Exhibit 13, which no longer showed a "normal" hook, the Kopans wire had been displaced between the placement and the surgery. No expert was asked to comment on the appearance and placement of the wire in Exhibit 16.

Typically, lawyers are permitted to draw reasonable inferences from the evidence and discuss those inferences in closing arguments. See *State v. Ervin*, 320 Kan. 287, 291, 566 P.3d 481 (2025); *State v. Potts*, 205 Kan. 47, 53-54, 468 P.2d 78 (1970). The key term is "*reasonable* inferences." In medical malpractice cases, expert testimony is required to establish the applicable standard of care and causation unless the lack of reasonable care or proximate cause is apparent to an average layperson based on common knowledge or experience. *Puckett v. Mt. Carmel Regional Medical Center*, 290 Kan. 406, 435-36, 228 P.3d 1048 (2010). More generally stated, expert testimony is necessary when specialized knowledge is needed to help the trier of fact understand evidence. K.S.A. 2024 Supp. 60-456(b); *State v. Love*, 305 Kan. 716, 725-26, 387 P.3d 820 (2017) (expert testimony necessary to discuss medical matters beyond the common knowledge of laypersons or medical diagnoses or effects of possible medical conditions).

Despite the pointed testimony throughout trial about the appearance of the first localization wire shown in Exhibit 13 and its apparent abnormal bend, there simply was no testimony regarding the appearance of the second localization wire depicted in Exhibit 16. And, whether the placement and condition of the wire shown in Exhibit 16 was "normal" is not a matter within the common knowledge of lay people. Neither counsel for the parties nor any of the jurors were qualified to opine about the propriety of the placement and condition of that second wire without explanation by expert witnesses.

19

Even though the exhibit had been properly entered into evidence, because no medical expert specifically discussed Exhibit 16 and the wire shown in the exhibit, it was error for defense counsel to ask the jurors to examine the exhibit and draw their own inferences regarding the propriety of the wire placement in the second surgery.

The error, however, does not require reversal, though we acknowledge this is a close call. Expert testimony at trial focused, in part, on the positions of the localization wires and the appearance of the first wire in Exhibit 13 as potentially unusual. The plaintiff's expert witness, Dr. Craig Anderson—the surgeon who performed Short's lumpectomies—testified that he removed only healthy tissue during the first surgery after following the Kopans wire to the surgical site. He added that the end of the wire from the first surgery appeared straightened out, rather than hooked, but he also opined that the radiograph images were typical of those taken after a lumpectomy. The record shows that other images from July 15, 2019—Short's second surgery—were also examined during Dr. Anderson's testimony, although the record is unclear whether the precise images examined during his testimony were similar to Exhibit 16. Defense counsel foreshadowed its theory by asking Dr. Anderson how a patient is moved from a gurney to the operating table and about which medical professional removes the tape securing the wire in place, suggesting that movement may have affected the first wire's placement. But Dr. Anderson was not asked specifically about the *appearance* of the wire placed in the second surgery as defense counsel suggested in its closing.

The improper argument that Exhibit 16 showed a "normal" unstraightened wire was consistent with all the expert testimony. Dr. Anderson testified that the wire shown in Exhibit 13—the specimen radiograph taken after the first surgery—had been straightened to an extent. While he suggested that this was not abnormal, it impliedly differentiated the wire shown in Exhibit 13 from other "normal" localization wires. Otherwise, the comment about it being straightened would have been superfluous. At the same time, the defense experts devoted time to explaining what a "normal" localization

20

wire looked like. The fact that the wire in Exhibit 13 was straightened more than typical neither disproved nor proved Short's case in light of Dr. Anderson's testimony. Likewise, defense counsel's request that the jury conclude that the wire in Exhibit 16 was "normal" did not support the defense position that the wire was somehow dislodged more than it supported the plaintiff's position of negligent placement.

Dr. Anderson testified that he again followed the localization wire to the surgical site for the second lumpectomy surgery. Given that Dr. Anderson removed the cancerous tissue in the second surgery, following the same procedure of using the localization wire, it is within the common knowledge of a layperson to conclude that the second wire was properly placed. If it had been improperly placed or had been displaced, one would logically conclude the second surgery would also have failed to remove the cancerous tissue. Reasonably, then, jurors could draw a reasonable inference that the first wire that led to an unsuccessful surgery was either improperly placed or displaced before the first surgery.

As discussed, the defense devoted significant trial time to demonstrating the wire placement procedure with actual "wire kits" and emphasizing that the localization wire was subject to displacement. Defense counsel's comments about Exhibit 16, while improper, were still consistent with both theories of the case in that the correctly positioned and not dislodged wire placed before the second surgery produced the desired surgical results.

Short argues that defense counsel's comments that the wire condition and placement in Exhibit 16 was "normal" improperly aided the defense theory that displacement, rather than negligence, led to the removal of healthy tissue during the first surgery. But this comment was not pulled entirely out of thin air—it was consistent with the defense theory of the case as presented throughout the trial and it was reasonable for the jurors to infer as such. What is more, defense counsel's closing argument seemed to

21

be responding directly to Short's invitation to show how it was possible that a hooked wire could be pictured at such an angle that it appears as an open wire. The jurors would have weighed Dr. Anderson's testimony that the images in Exhibit 13 from the first surgery appeared typical against the defense experts who opined that the first wire was abnormally bent. The straightened condition of the wire in Exhibit 13 could still have been the result of negligent placement, as the plaintiff contended. Defense counsel's improper argument about Exhibit 16 was unlikely to persuade a jury convinced of Dr. Robertson's negligence that the wire had been displaced instead. If the jury had been leaning toward finding for Short in opposition to the defense theory, the improper comment would not have persuaded it to return a different verdict.

Jurors are permitted to draw reasonable inferences from the permissible evidence, provided a reasonable inference could be drawn that was consistent with the defense attorney's statement that the wire shown in Exhibit 16 was "normal" as compared to Exhibit 13. Although defense counsel's argument was erroneous, it was unlikely to be prejudicial. "A reasonable probability does not mean that" Short "'would more likely than not have received a different verdict'" without defense counsel's error. It means "the likelihood of a different result is great enough to 'undermine[] confidence in the outcome of the trial'" in light of the entire record. *Smith v. Cain*, 565 U.S. 73, 75, 132 S. Ct. 627, 181 L. Ed. 2d 571 (2012); *Castleberry*, 308 Kan. at 807.

On this record, Dr. Robertson carried his burden to show there is no reasonable probability that the error affected the verdict. The possible dislodgement of the localization wire was a theme the defense carried throughout trial, including through its experts. Although the district court denied Short's objection to the improper reference to Exhibit 16, the court immediately reminded the jury it was instructed to decide the case only on the evidence received. We presume the jury follows instructions. *City of Mission Hills v. Sexton*, 284 Kan. 414, Syl. ¶ 20, 160 P.3d 812 (2007). Here the jury instructions not only required the jury to disregard statements of counsel which are unsupported by

22

the evidence but included a specific instruction which properly directed the jury to ground its standard-of-care findings on expert testimony alone, and not on the jurors' personal knowledge. See *Castleberry*, 308 Kan. at 810 (finding improper commentary during closing argument harmless, in part due to the instructions given to the jury). And Short's counsel, despite the objection, did not take any opportunity to rebut the comments about Exhibit 16 during his rebuttal argument.

For all these reasons, we find that defense counsel's argument, while improper, was harmless.

Affirmed.